[No. H026115. Sixth Dist. Jan. 31, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN DALE PERCELLE, Defendant and Appellant.

**COUNSEL**

Elisa A. Brandes, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Moona Nandi and Michele J. Swanson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**PREMO, Acting, P. J.—**

### A. INTRODUCTION

A jury convicted defendant Steven Dale Percelle of three counts of using an altered, stolen, or counterfeit access card (Pen. Code, §§ 484g, subd. (a), 487),[1] one count of attempting the same crime, and one count each of acquiring access card information with fraudulent intent (§ 484e, subd. (d)), receiving or withholding stolen property (§ 496, subd. (a)), and theft or unauthorized use of a vehicle (Veh. Code, § 10851, subd. (a)). The jury found defendant not guilty of a second vehicle theft count.

Allegations that defendant had suffered one prior strike conviction (§§ 667, subds. (b)–(i), 1170.12) and five prior prison terms within the meaning of section 667.5, subdivision (b) (prison priors) were separately tried to the jury. The jury found all prior conviction allegations to be true. The trial court sentenced defendant to 14 years in state prison and ordered him to pay restitution directly to the victims. (§ 1202.4.)

On appeal, defendant contends (1) that the trial court erred by requiring him to make a successful *Marsden*[2] motion before ruling on his *Faretta*[3] motion for self-representation, (2) that a one-year enhancement for a prison prior is impermissible when the term for the prior conviction was stayed, (3) that in this nonprobation context he cannot lawfully be required to pay victim restitution related to a crime of which he was acquitted, (4) that the court should have given a unanimity instruction, and (5) that the prosecution's exhibit No. 1 was inadmissible hearsay.

We find merit in defendant's second and third arguments and strike the challenged enhancement and restitution order. As modified, we shall affirm the judgment.

### B. FACTS

#### 1. The Discount Cigarettes Incidents

On September 5, 2002, defendant entered the Discount Cigarettes store on Camden Avenue in San Jose and asked to buy 30 cartons of cigarettes, which

---

[1] Hereafter, all undesignated statutory references are to the Penal Code.

[2] *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*).

[3] *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*).

cost $1,044. The store's owner, Thu Le Thy Nguyen, attempted to "swipe" the DiscoverCard defendant presented for payment but the machine would not process the card. Defendant manually entered the card number on the machine while Nguyen loaded the cigarettes into a box. Defendant signed the receipt and Nguyen recorded his driver's license number on it.

On September 11, 2002, defendant returned to Discount Cigarettes to buy 60 cartons of cigarettes for $2,088. This time he presented a Visa card but the machine again would not process the card when Nguyen ran it through. She entered the numbers manually and after a receipt was produced, defendant signed it and wrote his driver's license number on the receipt.

On September 13, 2002, defendant returned to buy another 60 cartons of cigarettes. He presented the same Visa card he had used two days earlier. Nguyen manually entered the numbers into the credit card machine and obtained a receipt that defendant signed. She again wrote his driver's license number on the receipt.

On or about September 17, 2002, Nguyen's brother-in-law, Sang Ngo learned that the DiscoverCard defendant had used on September 5, 2002, was fraudulent and that DiscoverCard had declined to pay the charges incurred on that date. Ngo, who had been in business himself for some time, was helping his sister-in-law in her first business venture. He instructed Nguyen to telephone him the next time defendant came to the store.

Defendant returned on September 20, 2002, seeking to purchase another 60 cartons of cigarettes. He presented a Visa card that was broken in half. Nguyen immediately telephoned Ngo. Ngo, in turn, telephoned the police and went over to Nguyen's store. He took down the license plate number of a minivan parked in front of the store and then went inside. Defendant was in the store. Ngo saw the broken card on the counter and asked defendant if that was what he planned to use to pay for the cigarettes. Defendant said that it was. Ngo miscalculated the purchase several times hoping to keep defendant in the store until the police arrived. Ngo did not intend to sell any cigarettes to defendant. He could tell just by looking at the broken card that it was counterfeit. It did not have the required hologram and was not shiny enough to look real. While Ngo was stalling, defendant looked uncomfortable and left, saying that he would be back. He took the broken card with him but left his driver's license behind. Ngo saw defendant get into the minivan parked in front and drive it away. The police arrived after defendant had left and Ngo gave them the license number of the minivan and defendant's name and driver's license number. Ngo then returned to his own store.

A little over an hour later, defendant returned to Discount Cigarettes and told Nguyen that he wanted to buy the cigarettes he had been discussing with

Ngo earlier. Defendant suggested she look for the paper upon which Ngo had made the price calculations but Nguyen told him she could not find it and telephoned her brother-in-law.

When Ngo received the second call from his sister-in-law he called 911 and immediately left to help Nguyen. Defendant was in the store when Ngo arrived. The same broken credit card lay on the counter. While Ngo was in the process of calculating the sale, the police arrived and arrested defendant.

## 2. The Vehicle Thefts

On August 18, 2002, a person identifying himself as Steven Percelle rented a car from Payless Rent a Car (Payless) for one week. Doug Rodman, the Payless employee who testified about the transaction, was not the agent who had worked with the customer and could not identify defendant as the person who rented the car. Based upon the information contained in the rental contract and his knowledge of the Payless standard practices, Rodman testified that the customer who rented the car had provided a driver's license and telephone number, gave a local address, and paid for the rental with a Visa credit card. The signature on the rental contract was not legible.

When the customer did not return the car when it was due, Rodman telephoned the number on the rental contract. The call was answered by a recorded greeting in a male voice that gave his name as Steven Percelle. Rodman left a message but no one returned the telephone call. On September 10, 2002, Rodman sent a demand letter to the address on the contract and it was returned with the notation, "Attempted, not known." The customer never returned the car and Payless reported it stolen on or about September 24, 2002. The car was found and impounded by law enforcement and Rodman retrieved it on October 11, 2002. There was no evidence pertaining to where the car had been between the date it was rented and the date Rodman retrieved it from the police impound. This incident was charged as count 5 in the information and was the only count for which the jury returned a not guilty verdict.

Sang Nguyen was the sales manager for Service Rent a Car (Service). On September 3, 2002, he rented a blue Toyota minivan to defendant for one week. Sang Nguyen identified defendant in court as the same person who rented the minivan on September 3, 2002. Defendant did not return the minivan when it was due. Sometime prior to September 20, 2002, after several unsuccessful attempts to contact defendant and get the minivan returned, Service reported it stolen. The minivan was recovered from defendant's possession when he was arrested in connection with the Discount Cigarettes incidents on September 20, 2002.

### 3. Victims' Testimony

Tom Spade owned a Visa card bearing the same number as that used to rent the car from Payless on August 18, 2002. Spade did not use his card to rent a car from Payless and did not know defendant. When the Visa fraud department contacted him about unusual activity on his account, he disputed nine or 10 of the charges totaling $3,989.32. One of the charges Spade disputed was the charge for a Payless car rental on August 18, 2002.

Patricia Tilghman owned a DiscoverCard bearing the same number as the one defendant used at Discount Cigarettes on September 5, 2002. She did not use her card on September 5, 2002, had never purchased cigarettes from Discount Cigarettes, and did not know defendant.

Peter Karagiannis owned a Visa debit card bearing the same number as the card used for purchases at Discount Cigarettes on September 11, 2002, and September 13, 2002. Sometime in October 2002, Karagiannis was alerted to unauthorized transactions on his account. He submitted an affidavit to his bank disputing the charges. Among the charges he disputed were two purchases at Discount Cigarettes in the amount of $2,088 each during the month of September 2002. Karagiannis did not use his card to buy cigarettes from Discount Cigarettes and did not know defendant.

### C. ISSUES

(1) Did the trial court err in insisting that defendant make a *Marsden* motion to discharge his attorney before the court would hear his *Faretta* motion?

(2) Is there sufficient evidence to support the jury's finding, for purposes of section 667.5, subdivision (b), that defendant had served a prior prison term for robbery when the term imposed for that crime had been stayed?

(3) May defendant lawfully be required to pay victim restitution related to the theft of the Payless vehicle when he was acquitted of that crime?

(4) Was a unanimity instruction required because there was evidence of two acts on September 20, 2002, upon which the jury might have convicted defendant of attempted use of a counterfeit access card?

(5) Was it reversible error to admit the prosecution's exhibit No. 1 into evidence?

## D. Discussion

### 1. *Defendant's Request to Represent Himself*

#### a. Introduction

Defendant was unhappy with his appointed counsel's trial tactics and made a midtrial motion to take over the defense of the case himself. The trial court insisted that defendant had to fire his attorney before he could take over the case and directed defendant to make a *Marsden* motion to do that. The court then heard the *Marsden* motion and denied it. Defendant did not reassert his request for self-representation and went forward with his appointed attorney. On appeal, defendant contends that the trial court erred in refusing to inquire into the reasons behind defendant's request to represent himself. The Attorney General responds that defendant never made an unequivocal request to represent himself, that the court's procedure effectively considered the self-representation issue and that a review of the sealed *Marsden* transcript should bear that out, or that the error of insisting on a *Marsden* motion was harmless. Defendant counters that we will find no reference in the *Marsden* hearing to the *Faretta* issues. We conclude that although the trial court never explicitly referred to *Faretta,* the court did consider the substance of the self-representation request and that any error in insisting upon a *Marsden* motion was harmless.

#### b. Background

Defendant waived his right to counsel and represented himself at the pretrial stages of this case. On January 28, 2003, the day trial was set to begin, defendant asked for, and received, appointed counsel. The matter was returned to the master trial calendar on standby status. Counsel promptly filed a motion to continue the trial date, which was granted.

On April 28, 2003, in the middle of the jury trial, after seven witnesses had testified, and after a discussion in chambers, the trial court noted for the record that defendant had told his attorney that he wanted to take over the conduct of his defense. The court explained that defendant would have to fire his attorney first because the court would not allow him to conduct the defense while the public defender's office continued as attorney of record. The trial court told defendant that in order to fire his attorney he would have to make a *Marsden* motion.[4] The trial court then directed the prosecutor to

---

[4] The colloquy was as follows:

"THE COURT: [Defense counsel], for the record, what is it that you wish to say?

leave the courtroom and inquired of defendant his reasons for wanting to discharge his attorney and take over the defense himself.

The transcript of the closed hearing reveals that the court asked defendant to confirm that he had previously represented himself in this case and when the matter got to trial he had asked for and received appointed counsel. Defendant confirmed that although his decision to request appointed counsel was made before trial got started, he was in a trial department assigned for

---

"[DEFENSE COUNSEL]: Your Honor, I had a long discussion with [defendant] this morning and it's now my understanding that he wishes to take over conducting the defense of his trial himself.

"THE COURT: Before that could occur, there would first have to be a *Marsden*, then he would have to make a *Faretta*. You are not discharged as trial counsel. You would remain as trial counsel.

"Are you saying, [defendant], that you want to fire [defense counsel] as your attorney?

"THE DEFENDANT: Right now, your honor—

"THE COURT: Hear me out. I'm not trying to trick you. I'm not trying to trap you. But she is your attorney of record. You can't take over your case with her as your attorney of record.

"THE DEFENDANT: I understand that.

"THE COURT: You have to fire her before you could ever get to represent yourself. That's a *Marsden* motion. Then you would have to make a motion for self representation. So are you saying you want to discharge or fire your trial attorney and the trial sounds to me like—it's about three-quarters or more over—before you say anything, just like I tell the witnesses, then make sure you understand the question and then tell me. Are you telling me now that you want to fire your attorney three-quarters or three-fifths of the way through the jury trial?

"THE DEFENDANT: Prior to me answering that, I would like to say something to the court. Is that okay?

"THE COURT: I would like an answer to that question first.

"THE DEFENDANT: I'm being forced into that answer, then yes.

"THE COURT: You are not being forced into that situation. This would have to be a free decision on your part, free and voluntary. No one can make you fire your attorney. You could attempt to fire your attorney but no one can make you do that. If you attempted to do that, it would be construed to be free and voluntary.

"THE DEFENDANT: Yes, I have no choice, your honor.

"THE COURT: Are you making a *Marsden* motion to discharge, [defendant], the public defender's office as your attorney of record?

"THE DEFENDANT: I have no choice if the court is telling me I must.

"THE COURT: You do have a choice because you can't be your own attorney and have her sit there as co-counsel. That motion is never going to be granted. If you want the best of both worlds, you want to control what is done but have her sit there next to you and help you as co-counsel, that motion just will not be granted.

"THE DEFENDANT: I have no intentions of asking for the public defender's office to be co-counsel, your Honor.

"THE COURT: Or anybody for that matter.

"THE DEFENDANT: I have no intentions of asking that.

"THE COURT: Are you making a *Marsden* motion to discharge or your fire [*sic*] [defense counsel] as your attorney?

"THE DEFENDANT: If the court is telling me that's the route to get to *Faretta*, than yes.

"THE COURT: There is no ifs, ands or buts about it. You have the choice to make if you want to be your own attorney. You must first make a motion to discharge her.

"THE DEFENDANT: That is correct."

trial at the time he made the request. The court then asked, "Now you are in trial, three-quarters three-fifths, completed and now you want to fire the attorney and swim on your own?"

Defendant replied, "Well, yes, basically, yes, your honor. If I could say something to the court at this point." The court allowed defendant to explain and defendant went on to talk about why he thought his attorney should have explored the question of Discount Cigarettes' compliance with its credit card agreements. Defendant's concern was that the jury should understand that the store owner's failure to obtain a physical imprint of cards that did not "swipe" was at least one of the reasons the credit card company refused to pay the store for the purchase. He was frustrated with his attorney for not eliciting this information on cross-examination of the two witnesses involved in the Discount Cigarettes transactions. The court gave counsel the opportunity to describe her concerns and allowed defendant to respond to counsel's explanation. The court then asked:

"Are you willing to submit the *Marsden* motion to me for my decision? In other words, for me to make up my mind whether to grant or deny your motion to fire [defense counsel]?" Defendant said, "Yes." The court then confirmed: "[Defendant], the singular issue, the singular reason you are wishing to fire or discharge [defense counsel] as your attorney based on your own words is 100 percent tactics?" Defendant confirmed that tactics were his sole concern.

The court found that tactics were the ethical responsibility of the attorney and denied the motion. Defendant did not reassert his request to represent himself or ask for a ruling on his initial request for self-representation.

c. Analysis

With a *Marsden* motion, the defendant is seeking a new lawyer on the ground his or her current attorney is providing ineffective assistance. (*Marsden, supra,* 2 Cal.3d at p. 123.) With a *Faretta* motion, the defendant is seeking permission to proceed without any lawyer at all. *Faretta* held that when a competent, literate defendant makes a timely, knowing, voluntary, and unequivocal waiver of the right to counsel, then the trial court must permit him or her to proceed without assistance of counsel. (*Faretta, supra,* 422 U.S. at pp. 835–836.) Under *Faretta,* there is no requirement that the defendant show that appointed counsel is not providing effective representation before self-representation may be permitted. Thus, if defendant was truly seeking to represent himself, the trial court was technically incorrect in specifying that defendant had to make a successful *Marsden* motion before he could make a *Faretta* motion for self-representation.

We recognize that defendant's initial request was not an unequivocal request for self-representation. The court asked defendant at least four times whether he really wanted to fire his attorney and defendant did not give one unequivocal answer to that question. That said, the trial court might have confused the issue by insisting upon a *Marsden* motion. In any event, when defendant finally agreed to the *Marsden* motion, he stated, "If the court is telling me that's the route to get to *Faretta*, then yes." Under the circumstances, we find that to be an unequivocal indication that defendant wanted to represent himself.[5]

█ Turning to the merits, we note that the parties agree that defendant's request was untimely. "When a motion for self-representation is not made in a timely fashion prior to trial, self-representation no longer is a matter of right but is subject to the trial court's discretion." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1365 [65 Cal.Rptr.2d 145, 939 P.2d 259].) "The 'reasonable time' requirement is intended to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice." (*People v. Burton* (1989) 48 Cal.3d 843, 852 [258 Cal.Rptr. 184, 771 P.2d 1270].) When the defendant makes an untimely request for self-representation, the trial court must inquire into the specific factors underlying the request and ensure a meaningful record for review. "Among other factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion. Having established a record based on such relevant considerations, the court should then exercise its discretion and rule on the defendant's request." (*People v. Windham* (1977) 19 Cal.3d 121, 128–129 [137 Cal.Rptr. 8, 560 P.2d 1187].) When the court denies a motion for self-representation, it is not required to state its reasons. Since the court must inquire sua sponte into the defendant's reasons for making the request, "there should be a sufficient record on appeal in such cases in order to sufficiently evaluate alleged abuses of discretion when motions for self-representation are denied." (*Id.* at p. 129, fn. 6.)

Although defendant contends that the trial court "refused to inquire into the reasons behind" his request to represent himself, the record refutes this assertion. The court never presumed that defendant wanted substitute counsel. The court was unquestionably looking into the reasons defendant wanted to

---

[5] The Attorney General also argues that defendant waived the *Faretta* issue when he did not renew his request for self-representation. Since we conclude that the trial court adequately addressed the issue, there was no reason for defendant to renew the request and, therefore, no waiver.

proceed *without* counsel. In the course of that inquiry, the court expressly or impliedly considered all of the *Windham* factors. The court ascertained the reasons defendant wanted to proceed on his own and gave defendant ample opportunity to explain. By questioning defendant and his attorney, the court assessed the quality of his counsel's representation. The court also considered defendant's proclivity to substitute counsel by confirming that defendant had previously represented himself and had asked for appointed counsel on the eve of trial. Although defendant did not request a continuance, the court's concern about the potential for delay may be inferred from its concern that defendant's request came when the trial was more than half over.

In sum, although incorrectly structured as a *Marsden* motion, the trial court considered defendant's request as required by *Faretta* and *Windham* and ensured that there is a record adequate for our review. In denying what the court characterized as a *Marsden* motion, the court simultaneously, albeit implicitly, denied defendant's *Faretta* request. In substance, therefore, defendant was afforded all the process that was due.

Furthermore, the trial court's implicit denial of the self-representation request was not reversible error under any standard. The primary reason defendant gave for wanting to take over the defense of his case was his concern that his attorney did not want to explore the store owners' failure to obtain a physical imprint of cards that did not "swipe." His attorney ultimately explored that issue in great detail when the prosecution recalled Sang Ngo and the trial court permitted defense counsel to question him on the subject.

Defendant relies upon *People v. Nicholson* (1994) 24 Cal.App.4th 584 [29 Cal.Rptr.2d 485], which, applying *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], held that denial of an untimely *Faretta* motion was not harmless error. *Nicholson* involved codefendants who made *Faretta* motions nine days before voir dire was to begin. (*People v. Nicholson, supra*, 24 Cal.App.4th at p. 587.) The appellate court concluded that, although the evidence against the defendants was overwhelming, "we simply cannot discount the fact that it might have been to their advantage to conduct voir dire and to present opening statements and closing arguments, thereby giving the jury an opportunity to hear from them (without the inconvenience of cross-examination). [Citations.] While it seems safe to say the defendants could not under any circumstances have been acquitted, they might have been able to avoid a true finding on the special circumstance allegation." (*Id.* at p. 595.)

The instant case is far different. Defendant's request came at an exceedingly late stage of the trial, well after voir dire and opening statements were

complete and after seven of the prosecution's 12 witnesses had already testified. Denial of the motion prevented defendant from cross-examining the rental car employees, but this did not prejudice him. He was acquitted on one of the vehicle theft counts and the evidence against him on the other count was overwhelming—the Service rental agent identified defendant as the person who rented the minivan and defendant was in possession of the same minivan on the day he was arrested, after Service had reported it stolen. At most, denial of the motion prevented defendant from addressing the jury himself during closing argument. Nevertheless, the jury was still bound to decide the case on the evidence, the greater part of which was undisputed. Given the evidence against him, the late stage of the trial, his counsel's willingness to pursue the line of questioning defendant felt was important, and the favorable result on one of the vehicle counts, even applying the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824], as defendant urges, we are convinced beyond a reasonable doubt that the error did not contribute to the verdict obtained.

### 2. The One-year Enhancement for a Prison Term That Was Stayed

The information alleged that defendant had suffered five prison priors, one of which concerned a 1986 conviction in Santa Clara County case No. 104096. The abstract of judgment for the 1986 case indicates that defendant had been convicted and sentenced to prison for robbery and burglary but that the robbery term was stayed pursuant to section 654. The information in the present case referred only to the robbery. There was no mention of the burglary.

In closing argument, defense counsel argued that because the robbery conviction in case No. 104096 had been stayed, defendant did not serve that prison term. During deliberations the jury sent a note observing that, in case No. 104096, the robbery count has the "concurrent" and the "654 stay" boxes checked. The note then asked: "Does this mean that the robbery sentence was served as required for special finding # five?" The trial court responded, "the answer to that question is yes." The jury found that defendant had served a prior prison term for the robbery. Defendant argues that there was insufficient evidence to support this finding and that the trial court erred in responding to the jury's question. We agree that the evidence does not support the finding.

In pertinent part, section 667.5, subdivision (b) provides, "the court shall impose a one-year term *for each prior separate prison term served* for any

felony." (Italics added.) Thus, the question is whether the evidence is sufficient to support the finding that defendant *served* the term for robbery.[6]

The Attorney General argues that we should uphold the enhancement because to do otherwise would result in a "windfall" for defendant simply because the prosecutor alleged the wrong felony. In effect, the Attorney General asks us to affirm the enhancement based upon the burglary conviction, which was not alleged in the pleadings. The Attorney General cites no authority for this maneuver, nor do we imagine that there is any. Defendant is entitled to notice of the charges against him. (*In re Hess* (1955) 45 Cal.2d 171, 175 [288 P.2d 5].) He received no notice that the prosecution planned to seek an enhancement for the 1986 burglary conviction. In any event, the Attorney General's argument ignores defendant's claim that there is insufficient evidence that he served a prison term for the robbery conviction.

If the robbery term was stayed, it cannot be said that defendant served a prison term as a result of the robbery conviction. The Attorney General provides no argument or evidence to the contrary. Therefore, we will strike the enhancement imposed for the 1986 robbery conviction.

### 3. Restitution to Victim Spade

Defendant contends that since the jury acquitted him of the Payless vehicle theft, the trial court erred when it ordered him to pay restitution to victim Tom Spade, the owner of the Visa card number used to rent that vehicle. We agree.

In pertinent part, the California Constitution, article I, section 28, subdivision (b) provides: "It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons *convicted of the crimes* for losses they suffer." (Italics added.) Section 1202.4, subdivision (a) reflects that intention by providing that a "victim of crime who incurs any economic loss as a result of the commission of a crime shall receive restitution directly from any defendant *convicted of that crime.*" (Italics added.) The court must enter a victim restitution order in every case "in which a victim has suffered economic loss *as a result of the defendant's conduct.*" (§ 1202.4, subd. (f), italics added.)

---

[6] Defendant relies on *People v. Pearson* (1986) 42 Cal.3d 351, 361 [228 Cal.Rptr. 509, 721 P.2d 595], which held that a later prison term may not be enhanced by two convictions when the term for one of the two convictions was stayed pursuant to section 654. *Pearson* is not precisely on point because defendant's term was not enhanced as a result of both prior convictions. Defendant received an enhancement for the term that was stayed but no additional time for the prison term he did serve.

In this case, Spade testified that he disputed charges to his credit card totaling $3,989.32. This amount reflected the Payless transaction, cigarette purchases in Livermore, and purchases at Walgreens and Longs drug stores, among others. The trial court ordered defendant to pay restitution to Spade in the full amount of the disputed charges.[7]

We first dispose of the Attorney General's contention that defendant's failure to object to the order waives the issue on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 351–354 [36 Cal.Rptr.2d 627, 885 P.2d 1040].) Factual issues may be subject to the waiver rule, but an objection may be raised for the first time on appeal where it concerns an "unauthorized" sentence, i.e., one that "could not lawfully be imposed under any circumstance in the particular case." (*Id.* at p. 354.) Defendant's argument is that in this nonprobation context, the court imposed the order in excess of its statutory authority. This is a purely legal issue that is not subject to the waiver rule.

Turning to the merits, we note, as the Attorney General does, that all the cases that have considered the question of whether a defendant may be ordered to pay restitution for a crime he was not convicted of committing arise in the probation context. *People v. Lent* (1975) 15 Cal.3d 481 [124 Cal.Rptr. 905, 541 P.2d 545] (*Lent*), for example, affirmed an order for victim restitution as a condition of probation even though the restitution was ordered for a crime of which defendant was acquitted. The Supreme Court observed that ordinarily, when the jury exonerates a defendant of criminal responsibility for some economic loss, that result would preclude the court from including the related loss in a restitution order. (*Id.* at p. 487.) The court found the order proper, however, because additional circumstances developed in the prolonged probation hearing had convinced the sentencing court that the defendant should be required to pay restitution in spite of the acquittal. (*Ibid.*) Later cases reached similar results. (See *People v. Carbajal* (1995) 10 Cal.4th 1114, 1121 [43 Cal.Rptr.2d 681, 899 P.2d 67]; *People v. Goulart* (1990) 224 Cal.App.3d 71, 79 [273 Cal.Rptr. 477]; *People v. Baumann* (1985) 176 Cal.App.3d 67, 76 [222 Cal.Rptr. 32].)

Thus, it is well settled that a court may impose a victim restitution order as a condition of probation regardless of whether or not the defendant has been convicted of the underlying crime. But this rule flows from the

---

[7] Defendant briefly mentions that the restitution order is also impermissible because Spade did not claim any economic loss. The Attorney General ignores this argument and defendant does not revisit it in his reply. Because we find the order impermissible on other grounds, we need not reach the issue.

notion "that the granting of probation is not a right but a privilege, and that if the defendant feels that the terms of probation are harsher than the sentence for the substantive offense he is free to refuse probation." (*People v. Miller* (1967) 256 Cal.App.2d 348, 356 [64 Cal.Rptr. 20].) Because a defendant has no right to probation, the trial court may impose probation conditions that it could not otherwise impose, so long as the conditions are not invalid under the *Lent* criteria. (See *Lent, supra*, 15 Cal.3d at p. 486, probation conditions must be reasonably related to the crime of which defendant was convicted or to future criminality.)

■ The considerations are different here, where defendant was not granted probation but sentenced to state prison. The *Lent* criteria do not apply. We look to the governing statute for guidance. Our primary task in interpreting the statute is to determine the Legislature's intent in enacting it. When statutory language is clear and unambiguous, there is no need for construction. The plain language of the statute establishes what was intended by the Legislature. (*People v. Statum* (2002) 28 Cal.4th 682, 689–690 [122 Cal.Rptr.2d 572, 50 P.3d 355].)

■ The Attorney General points to subdivision (f) of section 1202.4, which requires the court to order restitution to a victim who has suffered economic loss as a result of the defendant's *conduct.* According to the Attorney General, this provision does not require a conviction. But subdivision (f) of section 1202.4 merely describes how to calculate the amount of restitution. The introductory paragraph of section 1202.4 states the legislative intent, i.e., that the victim of a crime should receive restitution directly from any defendant *convicted of that crime.* This language is clear and unambiguous. Indeed, our Supreme Court has recognized that ordinarily an acquittal would preclude the court from including the loss related to that crime in a restitution order. (See *Lent, supra*, 15 Cal.3d at p. 487.) That is not to say that an acquittal on one count will preclude the imposition of a restitution order under all circumstances. We merely hold that in the nonprobation context, a restitution order is not authorized where the defendant's only relationship to the victim's loss is by way of a crime of which the defendant was acquitted.

■ In the present case, defendant was acquitted of the theft of the Payless rental car, which was apparently rented with Spade's credit card number. Although there were factual similarities between the Payless and the Service vehicle incidents, the jury did not accept those similarities as sufficient for a guilty verdict. Furthermore, the Service vehicle theft of which defendant was convicted was entirely unrelated to Spade. We cannot ignore the jury's

verdict on the Payless theft simply because defendant was convicted of a similar crime that did not involve Spade. The Longs, Walgreens, and other transactions included in the trial court's restitution order were never connected to defendant at all. In short, there is no evidence that the unauthorized charges to Spade's credit card were the result of any crime of which defendant was convicted. It follows that the trial court's order directing defendant to pay restitution to Spade was unauthorized and must be stricken.

### 4. The Failure to Give a Unanimity Instruction

Defendant argues that the trial court's failure to give a unanimity instruction deprived him of the right to have the jury unanimously agree on the specific act constituting the crime of attempted use of a counterfeit access card at Discount Cigarettes on September 20, 2002. Defendant argues that the evidence that he entered the store, left, then came back, gave the jury the opportunity to convict him of the crime based upon either his first visit that day or his second. The Attorney General responds that a unanimity instruction was not required. The Attorney General is correct.

"When a defendant is charged with a single criminal act but the evidence reveals more than one such act, the prosecution must either select the particular act upon which it relies to prove the charge or the jury must be instructed that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act. [Citations.] The unanimity requirement is constitutionally rooted in the principle that a criminal defendant is entitled to a verdict in which all 12 jurors concur, beyond a reasonable doubt, as to each count charged. [Citations.] [¶] Thus, in cases in which the evidence indicates the jurors might disagree as to the particular act that the defendant committed, the court should deliver the standard unanimity instruction." (*People v. Brown* (1996) 42 Cal.App.4th 1493, 1499–1500 [50 Cal.Rptr.2d 407].)

"[N]o unanimity instruction is required when the acts alleged are so closely connected as to form part of one continuing transaction or course of criminal conduct. 'The "continuous conduct" rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them.' [Citations.]" (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 275 [107 Cal.Rptr.2d 160].) That is, the failure to instruct is not error "unless there is evidence based on which reasonable jurors could disagree as to which act the defendant

committed." (*People v. Schultz* (1987) 192 Cal.App.3d 535, 539–540 [237 Cal.Rptr. 513].) It is immaterial that the two acts might have been charged as two separate attempts. If there was no evidence from which the jury could have found defendant was guilty of one attempt and not the other, the instruction is not required. (*People v. Riel* (2000) 22 Cal.4th 1153, 1199 [96 Cal.Rptr.2d 1, 998 P.2d 969].)

There is no reasonable basis to distinguish between defendant's first visit to Discount Cigarettes on September 20, 2002, and his second visit a little over an hour later. Defendant came into the store and asked to buy 60 cartons of cigarettes using the broken card. When Ngo's stalling made defendant nervous, he left, informing Ngo and Nguyen that he would return. When he returned a little over an hour later, he continued his effort to purchase the 60 cartons with the same broken card, urging Nguyen to look for the paper with the price calculations Ngo had made earlier. Defendant did not proffer a separate defense to the two acts. His defense was based entirely upon an asserted lack of proof—proof that the broken card was indeed a counterfeit access card. There is no conceivable construction of the evidence that would permit the jury to find defendant guilty of the crime based upon one act but not the other. No unanimity instruction was required.

### 5. People's Exhibit No. 1

The People's exhibit No. 1 is a 21-page document containing victim Peter Karagiannis's affidavit listing unauthorized transactions on his Visa check card and other correspondence. The third portion of the exhibit is a collection of receipts for the charges Karagiannis disputed. Included among the receipts and Karagiannis's list of disputed charges are two charges at Discount Cigarettes for $2,088 each. The dates of those charges correspond with the cigarette purchases made on September 11 and 13.

Defendant contends that the exhibit was improperly admitted under the business records exception to the hearsay rule (Evid. Code, § 1271) because the prosecution failed to establish the requirements of that exception.[8] His concern relates to the third portion of the exhibit, the receipts. The improper

---

[8] Evidence Code section 1271 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

introduction of these documents was prejudicial, he claims, not only because the receipts contained references to the transactions at Discount Cigarettes but also because there were receipts for other, unrelated transactions, most of which contained his name or driver's license information.

We first reject the Attorney General's contention that defendant waived the objection. Counsel raised the foundational objection when the exhibit was first marked for identification during the testimony of Lynn Roberson, a Washington Mutual Bank branch manager who assisted Karagiannis with the disputed charges. The court deferred a ruling on that objection until after Karagiannis testified. After Karagiannis testified, the court overruled the objection and admitted the evidence. There was no waiver.

Defendant argues that the prosecutor failed to establish that the receipts were collected in the usual course of business, when they were collected, or how they were prepared. Roberson stated that they "appeared to be" receipts and that she did not review them with Karagiannis. Karagiannis said that he did not know who at Washington Mutual had collected them and was not familiar with the Washington Mutual procedures. Assuming there is a gap in the foundational requirements for admitting these papers, any error was harmless. (See *People v. Duarte* (2000) 24 Cal.4th 603, 618–619 [101 Cal.Rptr.2d 701, 12 P.3d 1110].)

The prosecution had extremely strong evidence. There were eyewitnesses to each of the crimes of which defendant was convicted. Defendant's identity and his participation in those transactions could hardly be refuted. Defendant's criminal intent was also well established. Ngo had observed defendant driving the Service minivan that Sang Nguyen had personally rented to him weeks earlier and that he had failed to return. Ngo, an experienced businessman, determined that the broken card defendant presented on September 20, 2002, was obviously counterfeit because, among other things, it was missing the hologram commonly found on real cards. The cardholders whose card numbers were used in the three completed Discount Cigarettes transactions testified that they had not authorized those purchases. Indeed, Karagiannis testified to the two unauthorized purchases at Discount Cigarettes in the amount of $2,088. The exhibit was not necessary to prove this fact. And the several minor transactions reflected in the exhibit (food, gasoline, laundry, and hotel purchases totaling less than $500) were insignificant compared to the two large cigarette purchases. We conclude that it is not reasonably probable that the result would have been more favorable if the exhibit had been excluded. (*People v. Watson, supra*, 46 Cal.2d 818.)

E. Disposition

The judgment is modified to strike the one-year sentence enhancement imposed in connection with Santa Clara County case No. 104096 and to strike the order for restitution to Tom Spade in the amount of $3,989.32. As modified, the judgment is affirmed. The trial court is directed to amend the abstract of judgment and forward a copy of the amended abstract to the Department of Corrections.

Bamattre-Manoukian, J., and Walsh, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied April 27, 2005.

---

*Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.