Filed 2/13/15  P. v. Robinson CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050398 |
| v. | (Super. Ct. No. FVA1201183) |
| MONTEL LAMARR ROBINSON, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of San Bernardino County, Ingrid Adamson Uhler, Judge.  Affirmed as modified.

Laura P. Gordon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting, Tami Falkenstein Hennick and Collette Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Montel Lamarr Robinson of two counts of robbery (Pen. Code, § 211)[1] and one count of grand theft of a person (§ 487, subd. (c))[2] The court sentenced him to four years eight months in prison.

On appeal defendant contends (1) insufficient evidence shows he aided and abetted grand theft of a person; (2) the court's multi-tasking was improper; (3) the court abused its discretion by allowing him to be impeached with a petty theft infraction; and (4) the court improperly ordered him to pay victim restitution for the robbery charge of which he was acquitted (count 1). As to this last contention, we agree. But any error in the admission of impeachment evidence was harmless. Accordingly, with the exception of the restitution order for count 1, we affirm the judgment.

FACTS

*Robbery of Monica Quintero*

On the morning of May 13, 2012, Monica Quintero noticed two men together when she came out of a grocery store. Quintero was with her daughter and her cousin, Maria Munoz. As Quintero pushed a grocery cart toward her van, a man grabbed her from behind, put his hand on her neck, and took a pendant bearing her name from the gold chain she was wearing. He then came in front of her and grabbed the chain. Because Quintero held onto the chain, the man was only able to take part of it. The man left running, along with the other man.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] The information charged defendant with four counts of robbery, but the jury acquitted him of the robbery charge in count 1 and the court reduced the robbery charge in count 3 to the lesser included offense of grand theft of a person.

When shown photographs later, Quintero was unable to identify anyone as the man who took her chain. She described him to the police as a young black man about five feet eight inches tall.

Quintero's cousin Munoz identified defendant as the robber from a photographic lineup. Munoz was unable to identify him with 100 percent certainty in court, but testified defendant looked somewhat like the robber.

*Robbery of Jose Aguilar*

About three weeks later, Jose Aguilar and a coworker, who were maintenance workers at an apartment complex, stood near a truck looking at a roll of wire. Aguilar noticed a young man walking their way, but thought nothing of it, and turned back to inspecting the wire.

Suddenly, someone grabbed Aguilar's collar, slammed him to the ground, and tore off his "real thick, long" necklace. Aguilar fell to the ground. His coworker chased the suspect over a block wall, then down the street. A vehicle momentarily blocked the coworker's view, then he saw the suspect and his partner come out of a driveway entrance in a compact vehicle.

At trial, Aguilar identified defendant as the man who took his chain. He had also previously identified him from a photographic lineup. Aguilar told the investigating officer that the man who took his chain was a black male in his 20's and about six feet tall.

At trial, Aguilar's coworker testified he did not see the suspect in court.

*Grand Theft of Patricia Castillo*

Less than two weeks later, Patricia Castillo parked directly in front of a Big Lots store. Nine months pregnant, she was with her daughters, ages nine and six. She wore a thick gold chain which held her two wedding rings and a pendant.

3

Two young men were sitting right next to each other on the planter in front of the Big Lots store. They were talking to each other and "looked like they were just kicking back, sitting there waiting for somebody." Castillo's oldest daughter got out of the vehicle's passenger side, while Castillo held her younger daughter's hand and walked around the front of the vehicle.

One man looked at Castillo and she smiled at him. He snatched her chain and ran to the apartments on Jackson Street.

The other man stood up, walked away, and turned onto a street toward the Jackson Street apartments. Castillo screamed, "You're with him." The man responded, "No, I'm not," and "kept walking, looking down at his phone, looking up, looking around," and "shaking his head saying that he wasn't with him or motioning no."

Castillo identified defendant's photograph from a photographic lineup as the man who walked away. At trial she testified he was around 5 feet 11 inches tall.

*Robbery of Jessica Calix*

Less than two months later, Jessica Calix left her home and walked toward a vehicle where her husband was waiting. She wore a thick chain with a gold pendant with diamonds.

Two men walked on the sidewalk toward her. As they came closer, one man walked in front of her and grabbed at her necklace. He ran away, carrying the necklace. The other man ran with him.

At trial, Calix identified defendant as the person who grabbed her necklace. Calix testified she had described him to the police as a black male around five feet six inches tall. She had also previously identified defendant from a photographic lineup.

4

*Cash for Gold Store*

Maria Sanchez worked as a gold buyer at the Cash for Gold store. She testified defendant came into the store between three to four times a week. Sometimes he had gold to sell, such as rings (sometimes with diamonds), chains, earrings, and pendants (often religious pendants with female Mexican names). Other times he had no gold to sell, but accompanied another person.

*Police Interview*

A detective testified defendant is six feet two inches tall. In a police interview, defendant had first denied ever being in the Cash for Gold store, but had later stated he might have been applying for a job.

*Defense Case*

Defendant testified on his own behalf. During direct examination, he admitted he had pled guilty to a petty theft infraction in 2011. He denied having anything to do with any of the robberies. He denied ever being in the Cash for Gold store.

DISCUSSION

*Substantial Evidence Supports Defendant's Conviction for Grand Theft of a Person*

Defendant contends insufficient evidence supports the finding he aided and abetted the grand theft of Castillo. In considering his contention, we review the whole record in the light most favorable to the judgment "'to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Mayfield* (1997) 14 Cal.4th 668, 767.)

5

An aider and abetter acts with knowledge of the perpetrator's unlawful purpose and with the intent to facilitate the crime, and directly or indirectly aids, promotes, or encourages the commission of the offense. (*People v. Beeman* (1984) 35 Cal.3d 547, 561; *People v. Villa* (1957) 156 Cal.App.2d 128, 133-134.) Whether a person who was present at the time and place of a crime was an aider and abettor is a factual question "for the jury to decide from all the circumstances proved [citations]." (*People v. Wilson* (1928) 93 Cal.App. 632, 636.) "Mere presence at the scene of a crime which does not itself assist its commission or mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting." (*In re Michael T.* (1978) 84 Cal.App.3d 907, 911.) The jury may, however, "consider [these factors] in assessing a defendant's criminal responsibility." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 530.) For example, an aider and abettor's presence with the perpetrator may serve "to divert any suspicion as to their purpose," or allow the aider and abettor "to give warning of the approach of anyone seeking to interfere with their enterprise" or to help the perpetrator escape. (*Wilson*, at p. 636.) Any one of these purposes may be sufficient to show a defendant aided and abetted the commission of a robbery. (*Ibid.*) Other factors which the fact finder may consider are the defendant's conduct before and after the offense, including flight from the crime scene. (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094-1095.)

Substantial evidence supports the jury's finding defendant aided and abetted the grand theft of Castillo's necklace. His presence at the crime scene allowed him to look out for interference and also diverted suspicion from his partner and him — Castillo believed they were conversing and "kicking back," and she even smiled at defendant. Immediately after the crime, he left the scene and walked in the same direction as the thief. The jury could reasonably infer defendant's actions under these circumstances shared a common scheme with the other robberies in which he and his partner were involved. This is sufficient evidence defendant aided and abetted the crime.

6

*Defendant's Complaint About the Court's "Multi-tasking" is not Cognizable on Appeal*

At the close of the People's case and before defendant testified in his own defense, the judge informed the jury she was "multi-tasking" and trying to do research for a "huge motion" in an upcoming death penalty case, but had been "listening to all of the proceedings" and was capable of doing that. She assured the jury she "could completely pay attention to the trial as [she was] working up [there]." She reiterated, "I am paying attention, but I'm also getting my other work done."

Defendant contends the court's announcement it was multi-tasking trivialized his case to the jury. He also contends the court's timing, by announcing its multi-tasking immediately before he testified, denigrated the defense in the jury's eyes. He additionally asserts the court's multi-tasking "was the equivalent of having no judge at all" and constituted structural error.

As a threshold matter, defendant has forfeited this claim by failing to object below. (*Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184, fn. 1; see *Arabia v. BAC Home Loans Servicing, L.P.* (2012) 208 Cal.App.4th 462, 478.) Defendant asserts an objection would have been futile, but this assertion is speculative. Alternatively, he contends there was no tactical reason for his trial counsel's failure to object and he therefore received ineffective assistance. But, on the other hand, he asserts his trial counsel did not object because an objection would have "further embed[ed] the issue in the minds of the jurors"; thus, defendant himself posits a tactical reason for his counsel's decision.

Even addressing the issue on the merits, although we agree that multi-tasking by courts should not become the norm, we conclude in this case it did not constitute judicial misconduct or error. Defendant does not cite any particular instance in the record where the court's attention deviated from his trial. The court told the jury that it had been listening while multi-tasking "to all of the proceedings," not simply during defendant's testimony. Furthermore, the court's admonitions and rulings during

7

defendant's testimony revealed she was paying attention. In addition, we "presume the official duty has been regularly performed [citation], and this presumption applies to the actions of trial judges . . . ." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1462, fn. 5.) Finally, the judge instructed the jury, "Do not take anything I said or did during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be." Jurors are presumed to have followed the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

*Defendant Was Not Prejudiced by the Court's Ruling He Could Be Impeached with an Infraction*

Defendant contends the court abused its discretion by ruling he could be impeached with an infraction. The record contains only the following information on the infraction. In 2011, defendant was arrested for second degree commercial burglary. While defendant was in custody, the offense was reduced to a petty theft infraction pursuant to a plea bargain agreement and defendant pleaded guilty to the infraction.

Prior to the instant trial, defense counsel moved to exclude evidence of defendant's petty theft infraction for impeachment purposes should he choose to testify. The court's initial indicated ruling was to allow the prosecution to impeach defendant with the infraction because it is a crime of moral turpitude. But the court stated it would research (1) whether any case law prohibited the court from doing so absent a felony or misdemeanor conviction, and (2) whether *People v. Wheeler* (1992) 4 Cal.4th 284 (*Wheeler*) would require the People to call witnesses to prove the underlying misconduct. After completing its research and finding no case on point, the court ruled defendant could be impeached with "that petty theft as an infraction" because courts look to the conduct, not to the nature of the conviction, and because the infraction was reduced from a second degree commercial burglary pursuant to a plea bargain agreement.

8

At the outset of defense counsel's direct examination of defendant, the following colloquy ensued:

"Q  Mr. Robinson, um, let's get something out of the way real quick: On September 22nd, 2011 —

A  Yes, sir?

Q  — you were involved in an infraction petty theft; is that correct?

A  Yes, sir.

Q  You pled guilty to that; is that right?

A  Yes, sir."

As defendant acknowledges, the "prosecutor did not cross-examine [him] about this conviction or the underlying conduct, nor offer an official record of the conviction." The prosecutor *briefly* mentioned the conviction in her rebuttal closing statement in the context of her discussion of many other factors relating to credibility: "What are some factors you could consider in deciding whether somebody is credible or not? None of these victims or witnesses had a motive to lie. [Defense counsel] tells you that all you have is the unrefuted testimony of the defendant that he never went into that Cash For Gold [store]. Unrefuted testimony of an admitted liar. He testified. His credibility is just as much at issue as anybody else's. On that stand he admitted he lied to Detective Mills about . . . his whereabouts on one of the cases. He knew they were looking for him. They wanted to question him. He told them he was at somebody's wedding, then admitted to Detective Mills, 'No. I lied about that. I wasn't at the wedding.' He admitted to suffering an infraction conviction for a theft offense. These are all things you could consider." The prosecutor then pointed out that defendant's alibi for two of the charges against him involved his being with his mother or his grandmother, yet neither of them came in and testified.

Defendant is correct that a nonfelony "*conviction . . .* is inadmissible *hearsay* when offered as evidence that a witness committed misconduct bearing on credibility."  (*Wheeler*, *supra*, 4 Cal.4th at p. 297.)  But a "witness may be impeached with any prior *conduct* involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352."  (*People v. Clark* (2011) 52 Cal.4th 856, 931, italics added.)

Defendant asserts infraction misconduct (as opposed to misdemeanor misconduct, which was the specific subject in *Wheeler*, *supra*, 4 Cal.4th at p. 288) should not be admitted for impeachment purposes.  But *Wheeler* made clear that section 28, subdivision (d), "*requires* the admission in criminal cases of *all* 'relevant' proffered evidence unless exclusion is allowed or required by" specified evidentiary rules.  (*Wheeler*, at p. 292.)

Defendant complains he was impeached with the conviction rather than the underlying misconduct, but his own trial counsel introduced evidence of the conviction.  Although defendant contends his trial counsel rendered ineffective assistance by doing so, the attorney may have had tactical reasons for preemptively focusing on the conviction rather than the underlying conduct.  For example, defendant's admission of the petty theft infraction might have been less damaging to his credibility than a description of the underlying conduct would have been.  (*Strickland v. Washington* (1984) 466 U.S. 668, 689 [defendant must overcome presumption the challenged action "might be considered sound trial strategy"].)

10

Defendant contends the court itself ruled the prosecution could impeach him with evidence of the infraction conviction as opposed to his conduct. The court's oral ruling is ambiguous on this score, but stressed that the case law focuses on a defendant's *conduct*, not the nature of the conviction. Defense counsel did not ask for a clarification of the ruling.

Defendant also contends the court was required to conduct an Evidence Code section 352 evaluation before concluding he could be impeached with the petty theft infraction. A trial court has broad latitude under Evidence Code section 352 to exclude impeachment evidence. (*Wheeler*, *supra*, 4 Cal.4th at p. 296.) With respect to nonfelony conduct, "courts may and should consider with particular care whether the admission of [impeachment] evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Id.* at pp. 296-297.) It is unclear from the record whether defense counsel moved for exclusion of the evidence under Evidence Code section 352. Nor was the court required to "expressly cite Evidence Code section 352 in its ruling . . . ." (*In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1845.)

In any event, it is not reasonably probable the verdict would have been more favorable to defendant even if the court had explicitly considered Evidence Code section 352. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Gurule* (2002) 28 Cal.4th 557, 609 [trial court's error in admitting defendant's prior convictions for impeachment purposes was harmless under *Watson*].) The court's reasoning for its ruling was sound and was explicitly based in part on the fact the infraction had been reduced from a second degree commercial burglary charge (thus arguably incorporating a probative versus prejudice evaluation). Moreover, the evidence against defendant was strong, and the crimes were similar in nature and close in time. The credibility of his alibis and denials was weakened by his admission that he had lied during a police interview, by his failure to call any witnesses to corroborate his alibis, by the evidence that the victims of the crimes of which he was convicted had identified him as a

11

participant, and by Sanchez's testimony he was a frequent visitor to the Cash for Gold store. Given this overwhelming damage to his credibility, it is unlikely that his bare admission he pleaded guilty to a petty theft infraction, and the prosecutor's mention of it in her closing argument, altered the jury's assessment of the believability of his testimony.

*Restitution to Quintero was Unauthorized*

The jury acquitted defendant of the robbery of Quintero (count 1). Nonetheless, the court ordered defendant to pay a victim restitution fine for the crime. This was error, as the Attorney General concedes.

A sentence is unauthorized if it "'could not lawfully be imposed under any circumstance in the particular case.'" (*People v. Percelle* (2005) 126 Cal.App.4th 164, 179.) A defendant may raise the issue for the first time on appeal. (*Ibid.*)

Under section 1202.4, subdivision (a)(1), it "is the intent of the Legislature that a victim of crime who incurs an economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime." "[I]n the nonprobation context, a restitution order is not authorized where the defendant's only relationship to the victim's loss is by way of a crime of which the defendant was acquitted." (*People v. Percelle*, *supra*, 126 Cal.App.4th at p. 180.)

12

## DISPOSITION

The judgment is modified by striking the $220 victim restitution order as to count 1. In all other respects, the judgment is affirmed. The abstract of judgment does not reflect the imposition of this restitution order; thus the abstract of judgment does not need to be corrected.

IKOLA, J.

WE CONCUR:

FYBEL, ACTING P. J.

THOMPSON, J.