Filed 11/4/13  P. v. Nase CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C067313 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F06019) |
| v. | |
| DONYAE NASE et al., | |
| Defendants and Appellants. | |

Defendants Donyae Nase, Andre Love, and William England were driving through a residential neighborhood in the Meadowview area of Sacramento when they came upon two cars stopped in the middle of the street.  Unable to pass, they pulled over, got out of their car, and exchanged words with several people from the neighborhood.  Defendants identified themselves as members of a gang called the Meadowview Bloods (MVB) and a confrontation ensued, during which one of the victims was punched in the head, another was choked until he passed out, and others were threatened at gunpoint as one of the defendants tried to force his way into a victim's home.  The incident ended after several

witnesses saw Love fire several shots. Defendants fled, eventually dropping Love off near an emergency room with a gunshot wound to his leg.

Defendants were tried jointly and convicted by a jury of various charges. Among other things, Nase and England were convicted of active participation in a criminal street gang (Pen. Code, § 186.22, subd. (a) (hereafter § 186.22(a)); further unspecified section references are to the Penal Code), also known as "street terrorism." (E.g., *People v. Williams* (2009) 170 Cal.App.4th 587, 625-626 (*Williams*).)

Defendants appeal. Nase contends: (1) the trial court prejudicially erred in instructing the jury that his own felonious conduct would satisfy the element of "willfully assist[ing], further[ing], or promot[ing] felonious criminal conduct by members of the gang" for purposes of proving the charge of street terrorism; (2) the evidence was insufficient to support the street terrorism conviction; (3) section 654 bars the sentence imposed for the street terrorism conviction; and (4) trial counsel was prejudicially incompetent in failing to object to evidence of uncharged acts and other gang-related activity admitted by the prosecution's gang expert.

Love contends: (1) the trial court prejudicially erred in denying his request to impeach victim/witness Damon H. with a prior misdemeanor conviction; and (2) he is owed additional presentence custody credit.

England contends: (1) the evidence was insufficient to support the street terrorism conviction; and (2) the victim restitution fine was unauthorized, improper, and unconstitutional.

Each defendant joins in the claims of his co-defendants. (Cal. Rules of Court, rule 8.200(a)(5).)

We direct the trial court to amend the abstract of judgment as to Nase to stay his concurrent three-year sentence for the street terrorism conviction pursuant to section 654. We further direct the trial court to amend the abstract of judgment as to Love to reflect additional presentence custody credit. We affirm the judgments in all other respects.

2

Numerous witnesses testified at trial in this matter. While the record contains a fair number of inconsistencies, we recount the facts in the light most favorable to the verdicts. (See *People v. Snow* (2003) 30 Cal.4th 43, 66.)

In August 2009, Damon H. and his family, including his brother Jermaine H., his father Lawrence H., and his stepmother, D.W., lived in the Meadowview area of Sacramento. Damon's uncle, John M., lived next door. Damon's neighbor to the other side was D.H. Christina P. lived across the street.

On the evening of August 9, 2009, Damon was outside his home, along with Jermaine and John M. John M.'s friend, Mally, drove up in front of John M.'s house in a Buick and stopped in the middle of the street, where he chatted with John M. A Lexus came from the opposite direction, pulled up alongside Mally's car, and idled while the driver talked with Mally.

Sometime later, Love drove up in a Dodge Magnum. Unable to pass due to the position of the Lexus and the Buick, Love stopped the car and got out, followed by passengers Nase and England. Love, who was wearing a red shirt and a necklace with a gold AK47 medallion on it, walked over to Mally and said something to the effect of, "This is my neighborhood." "[W]hy are you in the middle of our street?" Mally told John M. to go inside, which he did, and Mally drove away.

Defendants asked Damon and Jermaine where they were from, meaning what neighborhood or gang. Damon responded, "Nowhere, not from here." One or more of the defendants said, "Meadowview Bloods," and "This is Meadowview."

Lawrence, who was wearing blue house shoes, walked out to talk with the occupants of the Lexus. Nase yelled at him, telling him to take off his "blue rag shoes" or go back inside. Lawrence ignored him and headed back towards the house. Nase walked toward Lawrence and said, "I'll take your phone." Lawrence continued to ignore

him and kept walking towards the house. All three defendants followed behind Lawrence as he walked, forming something of a half-circle around him. Nase punched Lawrence in the eye, drawing blood and causing Lawrence to stumble.

Damon saw Love leaning towards Lawrence. Fearing for his father's safety, Damon punched Love. As England stood by and watched, Damon and Love began to fight, each taking swings at the other. Love grabbed Damon and placed him in a headlock, choking him until he lost consciousness. Jermaine kicked Love in the groin, causing him to release his hold on Damon.

When Damon came to, Jermaine helped him up and walked him partway towards the house. At the same time, Love went back to the Dodge and retrieved a gun from inside the car. As Love started towards the H. house with gun in hand, D.W. yelled at him to leave. headed into her garage with Love following behind her. D.W. testified at trial that it was at this point that Love first fired the gun several times towards her house.

Damon testified that, as he made his way to the garage, someone yelled, "He gots a gun." Damon turned and saw Love pointing a handgun at him and Lawrence, who was also making his way toward the garage. Damon quickly pushed his father through the garage and into the house and followed him inside.

D.W. stood at the top of the steps leading from the garage into her house. Love stood on the bottom step, pointing the gun at her chest as he argued with her and tried to force his way inside. D.W. told him, "[Y]ou are not coming into my house." Love said, "Where is them niggers at? Where did they go?" and demanded, "Let me in because I know these niggers are in here." He tried to push his way into the house, but D.W. stood in the doorway preventing him from entering. Love tried several times to push the door open, but D.W. told him, "No, I got my kids in here."

Love left, but quickly returned with England and tried to kick in the door. England stood behind Love and told D.W. he wanted to come in. After about a minute, Love and England left the garage. Love stood in the driveway and fired "a couple of

4

shots." D.W. testified that Love fired in the direction of Drew's house next door. Neighbor Christina P. testified she saw the shooter fire the first of two shots while pointing the gun in her direction (i.e., across the street, away from the H. house), but she did not see which direction the second shot was fired because she had by that time ducked down to protect herself. Defendants could be heard yelling "motherfucker" and other obscenities towards the H. house.

All three defendants left together in the Dodge Magnum. At some point, Nase and England dropped Love off near Kaiser Hospital's emergency room and continued on without him. They were eventually stopped by police. A search of the car revealed five live rounds of ammunition, two of which were underneath the driver's seat.

In the meantime, hospital staff found Love wandering around in the alley outside the hospital, agitated and bleeding from a wound to his leg. He yelled at staff and refused help, but eventually relented and allowed emergency room doctors to examine him. When asked how he received the gunshot wound, Love said he "didn't know what happened."

Damon and D.W. identified each of the defendants in field show-ups. Damon noted that England had changed his shirt.

At different times throughout the ordeal, D.W., John M., Christina P., and Jermaine each separately called 911. In the recording of Jermaine's 911 call which was played for the jury, voices could be heard in the background saying, "Is it loaded? Are you ready to go? All I got to do is cock it." At trial, Damon could not determine whether the voice in the background was that of his father. Voices could also be heard to say, "I just told you they got to give it to me, Drew," and, "[L]ight them niggas up, Dad."

England testified in his own defense. He claimed the incident started when Lawrence and Love got into a fight after Lawrence grabbed the chain off of Love's neck. The fight then escalated when Damon and Nase interjected themselves. England testified

5

that Lawrence had a gun and fired three shots, hitting Love. He denied that he or his co-defendants had a gun or went into the H.'s garage.

Nase, Love, and England were charged by information with aggravated battery (§ 243, subd. (d)--count one); assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(1)--count two); assault with a firearm (§ 245, subd. (a)(2)--count three); first degree burglary (§ 459--count four); active participation in a street gang (§ 186.22(a)--count five); possession of a firearm by a felon (former § 12021, subd. (a)(1)--count six); and possession of ammunition by a felon (former § 12316, subd. (b)(1)--count seven).

The information also alleged as follows: Nase, Love, and England committed the acts charged in counts one, two, three, four, six, and seven for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)); as to count one, Nase, Love, and England personally inflicted serious bodily injury (§ 1192.7, subd. (c)(8)); as to count three, Love personally used a firearm (former § 12022.5, subds. (a) & (d), § 1192.7, subd. (c)(8)); as to counts four and five, Love personally used a firearm (§ 1203.06, subd. (a)(1), former § 12022.5, subd. (a)) and was an armed principal (former § 12022, subd. (a)(1)); as to count seven, Love committed the offense while released on bail (former § 12022.1). It was further alleged that Nase served three prior prison terms (§ 667.5, subd. (b)), and Love and England each had a prior serious felony conviction (§§ 667, subds. (b)-(i), 1170.12) and served a prior prison term (§ 667.5, subd. (b)).

The trial court granted defendants' request to bifurcate the prior prison term and prior serious felony allegations. The matter was tried to a jury.

Nase was convicted of aggravated battery (count one) and active participation in a criminal street gang (count five). The jury found he personally inflicted great bodily injury. In bifurcated proceedings, the court found true the three prior prison term allegations.

6

Love was convicted of assault by means of force likely to cause great bodily injury (count two), first degree residential burglary (count four), felon in possession of a firearm (count six), and felon in possession of ammunition (count seven). The jury found he used a firearm during the assault. Love stipulated to the on-bail enhancement. In bifurcated proceedings, the court found true the two prior conviction allegations.

England was convicted of active participation in a criminal street gang (count five). In bifurcated proceedings, the court found true the two prior conviction allegations.

The trial court sentenced Nase to an aggregate term of seven years in state prison, Love to an aggregate term of 22 years, eight months, and England to an aggregate term of 10 years. As to each defendant, the trial court imposed various fees and fines and awarded presentence custody credit.

DISCUSSION

I

*Instructional Error*

Nase contends the trial court incorrectly instructed the jury on active participation in a criminal street gang. Specifically, he argues the jury was instructed, contrary to the clear language of section 186.22(a), that his own commission of a felony offense was sufficient to satisfy the element requiring proof that he willfully assisted, furthered or promoted felonious criminal conduct by other members of the gang.

The People argue the claim is forfeited for failure to object at trial and, in any event, there was no instructional error.

A claim that the trial court's instructional error deprived defendants of their substantial rights is not forfeited for lack of objection below. (§ 1259; *People v. Cabral* (2004) 121 Cal.App.4th 748, 750.) The question is whether the error, if any, resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818. (*People v.*

7

*Anderson* (2007) 152 Cal.App.4th 919, 927.) We find no error, and thus no miscarriage of justice.

Without objection, the trial court instructed the jury with CALCRIM No. 1400 as follows: "Defendants are charged in Count Five with participating in a criminal street gang in violation of [section] 186.22(a). [¶] To prove the defendant guilty of this crime, People must prove, one, the defendant actively participated in a criminal street gang at the time of the offense, two, when the defendant participated in the gang he knew that members of the gang engaged in or have engaged in a pattern of criminal gang activity, and, three, defendant willfully assisted, further[ed] or promoted felonious criminal conduct by members of the gang either by: [¶] A, directly and actively committing a felony offense; [¶] Or B, aiding and abetting a felony offense."

Section 186.22(a) defines the crime of active participation in a criminal street gang as "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang."

We are here concerned with the third element of section 186.22(a), otherwise referred to as the promote/further/assist element.

Nase was convicted of battery with serious bodily injury (count one) based on the attack on Lawrence H.. He was also convicted of active gang participation (count five) for willfully promoting, furthering, and assisting the felonious criminal acts of his co-defendants, at least one of whom represented himself as a member of the MVB, by directly and actively committing the felony battery on Lawrence.

Nase claims the promote/further/assist element of section 186.22(a) limits liability to those who *aid and abet* a specific felony committed by gang members, arguing support for his position can be found in *People v. Castenada* (2000) 23 Cal.4th 743 (*Castenada*).

8

In *Castenada,* the defendant pointed a gun at the victim and demanded money while one of the defendant's two companions did the same to a second victim. (*Castenada, supra*, 23 Cal.4th at p. 745.)  The defendant took the victim's watch and attempted to snatch a gold chain from his neck.  When the victim broke free and yelled for help, the defendant fled with his companions.  (*Ibid.*)  The defendant was convicted of robbery, attempted robbery, and active participation in a criminal street gang pursuant to section 186.22(a).  (*Castenada,* at p. 746.)  The section 186.22(a) conviction was upheld by the court of appeal.  (*Ibid.*)

Our state's highest court affirmed the decision of the appellate court.  (*Castenada, supra,* 23 Cal.4th at p. 746.)  In considering the meaning of the phrase "actively participates," another element of section 186.22(a), the court referred in dictum to the promote/further/assist element, saying:  "Section 186.22(a) limits liability to those who promote, further, or assist a specific felony committed by gang members and who know of the gang's pattern of criminal gang activity.  Thus, a person who violates section 186.22(a) has also *aided and abetted* a separate felony offense committed by gang members . . . .  [Citations.]"  (*Id.* at p. 749, italics added.)

Nase concedes that several courts have examined the promote/further/assist element of section 186.22(a) and concluded a defendant not acting alone is as liable for crimes personally committed as for crimes aided and abetted.  (*People v. Ngoun* (2001) 88 Cal.App.4th 432 [affirming conviction under section 186.22(a) for defendant who directly perpetrated underlying felony rather than aiding or abetting another in the commission of those felonies]; *People v. Salcido* (2007) 149 Cal.App.4th 356 (*Salcido*) [accord], overruled on another point as stated in *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1137, fn. 8 (*Rodriguez*); *People v. Sanchez* (2009) 179 Cal.App.4th 1297, 1306-1308 (*Sanchez*) [accord], overruled on another point as stated in *Rodriguez,* at p. 1137, fn. 8.)  He contends those cases were wrongly decided, arguing *Castenada,* "albeit in

9

dicta, comports with the plain statutory language" of section 186.22(a) and thus supports his claim of instructional error.

The language in *Castenada* seized on by Nase must be read in context. The court, rejecting Castenada's assertion that a defendant must hold a leadership position in the gang in order to have "actively participate[d]" for purposes of section 186.22(a), relied instead on the promote/further/assist language to require something "more than nominal or passive" participation. (*Castenada, supra,* 23 Cal.4th at p. 752; see also *id.* at pp. 747-752.) In that context, the *Castenada* court described *a means* by which a defendant could be found to have "actively participate[d]" under the statute--by aiding and abetting another--not *the sole means*, as Nase suggests.

Similarly, Nase's reliance on *People v. Albillar* (2010) 51 Cal.4th 47 is misplaced, as the issue there was whether the phrase "any felonious criminal conduct" includes an unwritten requirement that the " 'felonious criminal conduct' . . . be gang related." (*Id.* at p. 51.) We are not faced with that issue here, and thus we make no determination in that regard.

Since briefing was completed in this case, our state's highest court issued *Rodriguez, supra,* 55 Cal.4th 1125. While the issue under consideration there was "whether the third element [of section 186.22(a)] is satisfied when a gang member commits a felony while acting alone" (*id.* at p. 1131), it is worth noting the high court's comment that, "[n]othing in the language of section 186.22(a) would suggest that one may not promote, further, or assist 'in any felonious criminal conduct by members of that gang' by either aiding and abetting other gang members in committing a felony *or* by directly committing a felony with other gang members." (*Id.* at pp. 1135-1136.)

In short, there is no authority of which we are aware that limits the promote/further/assist element of section 186.22(a) to those who aid and abet a felony committed by gang members. Thus, there was no instructional error.

10

## II

### *Sufficiency of Evidence to Support Section 186.22(a) Conviction*

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.] [¶]  Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder."  (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

### A.    *Defendant Nase*

As an alternative to his claim of instructional error, Nase contends there was insufficient evidence to support his conviction for street terrorism given that his own direct commission of a felony cannot establish the promote/further/assist element of section 186.22(a), and the jury acquitted him of all aiding and abetting charges and enhancements.

Having already concluded in part I of this opinion that the promote/further/assist element of section 186.22(a) may indeed be satisfied by a defendant's own direct commission of a felony offense, we reject Nase's claim.

*B.* *Defendant England*

England claims the evidence was insufficient to support his section 186.22(a) conviction because he was acquitted of all other charges and there was no evidence he aided or abetted any felonious criminal conduct by his co-defendants.

The People argue that inconsistent verdicts are permissible where, as here, there is substantial evidence to support the section 186.22(a) conviction. We agree.

"It is well settled that, as a general rule, inherently inconsistent verdicts are allowed to stand. [Citations.] The United States Supreme Court has explained: '[A] criminal defendant . . . is afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient.' [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 656, quoting *United States v. Powell* (1984) 469 U.S. 57, 67 [83 L.Ed.2d 461].)

"[T]he fact that a guilty verdict on one count is inconsistent with an acquittal verdict on another no longer compels reversal if there is substantial evidence to support the conviction. [Citation.]" (*People v. Pahl* (1991) 226 Cal.App.3d 1651, 1657.)

As CALCRIM No. 1400 instructed the jury here, active gang participation requires proof defendant (1) actively participated in a criminal street gang at the time of the offense, (2) knowing that members of the gang engage in or have engaged in a pattern of criminal gang activity, and (3) willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang either by (a) directly and actively committing a felony offense, or (b) aiding and abetting a felony offense.

12

The instruction explained that, "[t]o prove that the defendant aided and abetted felonious criminal conduct by a member of the gang, the People must prove that:  [¶] 1. A member of the gang committed the crime; [¶] 2. The defendant knew that the gang member intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the gang member in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the commission of the crime."

The instruction further explained that "[s]omeone *aids and abets* a crime if he knows of the perpetrator's unlawful purpose, and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

"[T]he weight of authority and sound law require proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense."  (*People v. Beeman* (1984) 35 Cal.3d 547, 560.)

Our independent review of the record reveals the evidence is sufficient to support England's section 186.22(a) conviction.  The incident started when Love confronted Mally by saying, "This is my neighborhood."  "[W]hy are you in the middle of our street?"  All three defendants confronted Damon and Jermaine, asking where they were from (i.e., which neighborhood or gang).  At least one of the defendants indicated he was a member of the MVB.  When Nase yelled at Lawrence to take off his blue shoes, and followed Lawrence as he walked back towards the house, England signaled his complicity in Nase's attack on Lawrence by following behind and helping to surround Lawrence.  When Nase and Love fought with Damon, England stood nearby watching.  As Love attempted to force his way into the H. house, England followed immediately behind, telling D.W. he "wanted to come in."  After Love fired his gun, England, Love, and Nase left the scene together.  Nase and England dropped Love off near the hospital

13

and continued on together in the same car until they were stopped by police, but not before England took the time to change his shirt.

Detective Justin Saario, the prosecution's gang expert, testified regarding the MVB gang, its history, its habits, its activities, and the manner in which its members associate. Saario also testified that, in his opinion, England and his co-defendants were active MVB gang members at the time of the incident. Saario based his opinion on a number of things, including police validations and defendants' prior associations with other gang members, their prior police contacts, their activities, their monikers, their attire, their tattoos, and their own admissions regarding gang affiliation. Saario testified in particular about England's admitted long-standing membership in the MVB, as well as his criminal history in that regard, establishing directly and by reasonable inference that England actively participated in the gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity.

England argues that, if we were to give the proper effect to the jury's acquittals, we would conclude that the jury impliedly found he was "merely present at the scene." The jury's not guilty verdicts on the remaining charges may well have been the product of mistake, compromise, or lenity. The guilty verdict on the street terrorism charge reflects the jury's conclusion that England's involvement with the MVB gang was "more than nominal or passive" (*Castenada, supra,* 23 Cal.4th at p. 747), and his conduct on the day in question willfully promoted, furthered, and assisted in the felonious conduct of his co-defendants.

Sufficient evidence supports England's section 186.22(a) conviction for active gang participation.

14

III

*Section 654*

Relying on *Sanchez, supra,* 179 Cal.App.4th at page 1297, Nase contends that, in the absence of felonious activity other than that underlying the section 186.22(a) offense, section 654 bars multiple punishment for the street terrorism conviction and the felony battery conviction.  Thus, he argues, the concurrent three-year term imposed for his section 186.22(a) conviction must be stayed pursuant to section 654.

The People disagree with the holding in *Sanchez*, arguing *People v. Herrera* (1999) 70 Cal.App.4th 1456 (*Herrera*) is better reasoned.  There, the court of appeal held that section 654 permitted separate punishment for two crimes based on the same act where the defendant held "multiple criminal objectives." (*Id.* at p. 1466; see also *id*. at pp. 1466-1468.)  The People acknowledge, however, that the California Supreme Court granted review on this issue in *People v. Mesa* (2010) 186 Cal.App.4th 773 (review granted Oct. 27, 2010, S185688).

Since the filing of the briefs in this case, our state's high court issued its ruling in *People v. Mesa* (2012) 54 Cal.4th 191 (*Mesa*), rejecting *Herrera* and affirming *Sanchez* with respect to the question before us.  The charges in *Mesa* arose out of two separate incidents in which the defendant, an admitted gang member, shot a victim and was convicted of and punished for assault with a firearm, possession of a firearm by a felon, and active participation in a criminal street gang (§ 186.22(a)).  (*Mesa,* at pp. 193-195.) The *Mesa* court stated:  "Section 654 applies where the 'defendant stands convicted of both (1) a crime that requires, as one of its elements, the intentional commission of an underlying offense, and (2) the underlying offense itself.'" (*Mesa* at p. 198, quoting *Sanchez, supra,* 179 Cal.App.4th at p. 1315.)

Here, Nase was convicted of felony battery and street terrorism, with the former serving as the underlying offense for purposes of the latter.  Under *Mesa,* section 654

15

does not authorize punishment for both.  We note that the trial court's imposition of a concurrent three-year term for the section 186.22(a) conviction avoids the multiple punishment Nase seeks to address.  Nonetheless, we shall direct the trial court to modify the abstract of judgment to indicate the concurrent three-year sentence is also stayed pursuant to section 654.

IV

*Ineffective Assistance of Counsel*

Nase claims his trial attorney was incompetent for failing to object to, or attempt to exclude, limit, or sanitize, evidence of uncharged acts and other gang-related activity as testified to by gang expert Detective Saario.

To prevail on a claim of ineffective assistance of counsel, defendant must show: (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688 [80 L.Ed.2d 674, 693]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.)  Prejudice is shown when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Strickland,* at p. 694 [80 L.Ed.2d at p. 698].)

Where the claim is based on trial counsel's failure to render an objection, a defendant must prove not only the absence of a reasonable tactical explanation for the omission but also that the motion or objection would have been meritorious.  (*People v. MacKenzie* (1995) 34 Cal.App.4th 1256, 1272.)  That an attorney permits objectionable-- or arguably objectionable--testimony to enter the record does not of itself suggest incompetence.  At times otherwise inadmissible evidence may come out in another form, or the testimony may cut two ways.  (E.g., *People v. Ratliff* (1986) 41 Cal.3d 675, 692; *In*

16

*re Lower* (1979) 100 Cal.App.3d 144, 150.)  And "[b]ecause the decision whether to object is inherently tactical, the failure to object to evidence will seldom establish incompetence."  (*People v. Freeman* (1994) 8 Cal.4th 450, 490-491; see *People v. Frierson* (1979) 25 Cal.3d 142, 158.)

Where the reasons for trial counsel's failure to object to an alleged error are not revealed by the record, the claim of incompetence "must be rejected on appeal unless counsel was asked for an explanation and failed to provide one or there can be no satisfactory explanation."  (*People v. Mitchell* (2008) 164 Cal.App.4th 442, 467; see *People v. Pope* (1979) 23 Cal.3d 412, 426 [remedy lies in habeas corpus], clarified on another point in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.)

*Background*

Detective Saario testified as a gang expert in the prosecution's case-in-chief. Saario stated the MVB gang originated in the mid-eighties following the emergence of prominent gangs such as the Bloods and the Crips.  The MVB gang's territory includes Meadowview Road in Sacramento.  Saario testified that MVB members identify themselves with, among other things, the letters "B" and "M" which represent Blood and Meadowview, respectively.  The gang's primary activities include homicides, assaults with deadly weapons, robberies, narcotics sales and possession, and firearms possession. As for MVB's criminal activity, Saario testified regarding gang-related homicides which occurred in 2006 and 2007.

Saario testified that Nase, England, and Love were all active MVB gang members at the time of the August 2009 incident.  With regard to Nase in particular, Saario based his opinion on Nase's validation as a gang member in 2004, his prior association with other gang members (including England), his prior contacts with law enforcement, his clothing (e.g., pictures of Nase wearing red and draping himself with a red bandana), and his activities (e.g., pictures of Nase throwing gang hand signs, asking to be housed with

17

Bloods in jail, and telling jail officials he was with the Meadowview sect of the Bloods). Saario's opinion was also based on Nase's tattoos: "Piru" which stands for Bloods; a "C" and a "K" with the "C" crossed out, meaning "Crip Killer"; another "C" crossed out; and his moniker, "Trigger Ru," with "Ru" being short for "Piru."

Without objection, Saario testified regarding the following six incidents of uncharged acts and gang-related activity involving Nase (it is this testimony from which Nase's claim of error arises):

(1)     On August 18, 2003, Nase was arrested for selling narcotics in Caesar Chavez Park while wearing all red clothing.

(2)     On July 25, 1997, Nase, wearing a red and white checkered shirt, approached a car and told the victim he "spoke to Bossman who is in jail for murder" and Bossman told him the victim was a snitch. Nase punched the victim, knocking him to the ground, and took the victim's car.

(3)     On January 16, 1997, Nase, wearing a red jacket and burgundy pants and in the company of a validated Oak Park Blood gang member, was contacted for loitering. A search revealed Nase was in possession of rock cocaine.

(4)     On July 3, 1996, after a traffic stop, Nase, in the company of a validated MVB member, was arrested for possession of rock cocaine for sale.

(5)     On March 14, 1996, Nase, wearing a red 49'ers jersey, was arrested following a traffic stop, during which a search of the vehicle's trunk yielded several boxes of ammunition and a stolen handgun.

(6)     On August 31, 2004, Nase, in the company of England, was arrested for possession of a loaded firearm and other charges.

Saario testified further that gang culture commonly relies on fear and intimidation to gain respect. A gang member committing a violent act to instill fear and gain respect will in turn benefit the gang by instilling fear in the community and insuring victims and

18

witnesses will not cooperate with law enforcement. Saario stated there was an expectation that gang members back up one another during criminal activity.

Given Nase's gang tattoos, as well as evidence of Nase wearing gang colors, throwing gang signs, admitting his gang membership to jail officials, and requesting to be housed with Bloods in jail, any claim denying his gang membership would have been pointless, if not detrimental to the defense. Nase's defense counsel proceeded instead on the defense theory that Nase and the other defendants were no longer *active* gang members at the time of the incident, that they "were not there to be in a gang fight because Bloods don't fight Bloods," and that it was the victims who started the altercation and fired the gun. Thus, on this record, there is a reasonable tactical explanation why defense counsel allowed the evidence of the uncharged acts and gang related activity to be introduced.

Nase argues the evidence was cumulative or otherwise inadmissible, citing *Williams, supra,* 170 Cal.App.4th 587.

In *Williams*, the defendant was charged with weapon and drug offenses, active participation in a criminal street gang, and gang enhancements. The prosecution introduced evidence of three crimes in which the defendant was involved and 15 contacts between the defendant and law enforcement, some involving criminal activity. Some of the evidence was introduced multiple times for different purposes. (*Williams, supra,* 170 Cal.App.4th at pp. 598-599, & fn. 5.) The appellate court found that although some of the evidence was properly admissible, "it was an abuse of discretion to admit cumulative evidence concerning issues not reasonably subject to dispute. The sheer volume of evidence extended the trial--and the burden on the judicial system and the jurors--beyond reasonable limits, and the endless discussions among the trial court and counsel concerning the admissibility of such evidence amounted to a virtual street brawl." (*Williams*, *supra*, 170 Cal.App.4th at p. 611.) The court held the error was harmless, however, because the evidence was probative to the gang offense and enhancement, it

19

was not likely the jury's passions were inflamed, and the jury acquitted defendant of one gang enhancement and convicted him of a lesser offense on one count, showing the jury did not accept the evidence uncritically. (*Williams, supra,* at pp. 612-613.)

Here, like *Williams,* the challenged evidence was directly relevant to and probative of the gang offense and the gang enhancements. Like *Williams,* the jury demonstrated its critical consideration of the evidence by acquitting Nase of the gang enhancement. Unlike *Williams*, the evidence here was admitted only once, garnering very little discussion and few objections from counsel. The evidence of Nase's six prior contacts with law enforcement consumes just five pages in a reporter's transcript of over 1,900 pages. Nothing in the record indicates that the trial court intended to allow the prosecution the unfettered opportunity to "over-prove their case or put on all the evidence that they have." (*Williams*, *supra*, 170 Cal.App.4th at p. 610.) Indeed, the trial court instructed the jury regarding the limited purpose, specifically instructing the jurors not to conclude from the evidence that Nase is a person of bad character or is predisposed to commit crimes. We presume that the jury followed these instructions. (*People v. Williams* (2010) 49 Cal.4th 405, 469.)

V

*Restitution Order--England*

England contends the victim restitution order in the amount of $1,975 was improper in light of his acquittal of all charges involving victims. (*People v. Percelle* (2005) 126 Cal.App.4th 164, 180 (*Percelle*).)

We note first that we have some confusion regarding the nature of England's claim. It appears to be that the restitution order itself is improper for the reasons that we will discuss next. Even so, and noting that the court as part of its judgment ordered a restitution fine of $600 pursuant to section 1202.4, subdivision (b) and an additional restitution fine in the same amount pursuant to section 1202.45, England's brief

20

occasionally refers to "restitution fines."  That notwithstanding, given the manner in which his argument is stated, it appears that he challenges the restitution order in the amount of $1,975.

The California Constitution, article I, section 28, subdivision (b), states "(A) It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer.  [¶]  (B) Restitution shall be ordered from the convicted wrongdoers in every case, regardless of the sentence or disposition imposed, in which a crime victim suffers a loss, unless compelling and extraordinary reasons exist to the contrary.  The Legislature shall adopt provisions to implement this section . . . ."

Section 1202.4, subdivision (a)(1), provides:  "It is the intent of the Legislature that a victim of crime who incurs any economic loss as a result of the commission of a crime shall receive restitution directly from a defendant convicted of that crime."  Section 1202.4, subdivision (f), provides that the court must order a defendant to make victim restitution in every case in which a victim suffers economic loss due to a defendant's conduct.  Subdivision (k) of that section states that "victim" includes any person who has sustained economic loss as a result of a crime and is a relative or household member of the victim.

While a court may impose victim restitution as a condition of probation regardless of whether the defendant has been convicted of the underlying crime, the rule is different where, as here, the defendant does not receive probation.  (*Percelle, supra*, 126 Cal.App.4th at pp. 179–180.)  In *Percelle*, the defendant was convicted of one incident of vehicle theft but acquitted of another.  The trial court ordered restitution to the victim of the theft of which the defendant was acquitted.  (*Id.* at p. 178.)  The court of appeal reversed the restitution order.  Focusing on the language of section 1202.4, subdivision (a), the court held the restitution order was unauthorized because the defendant was not

21

convicted of that crime.  (*Id.* at p. 180.)  The losses included in the restitution order were not connected to the defendant; there was no evidence the unauthorized charges to the victim's credit card were the result of any crime of which the defendant was convicted. (*Id*. at p. 181.)

The *Percelle* court did not find an acquittal precluded restitution in all circumstances.  "We merely hold that in the nonprobation context, a restitution order is not authorized where the defendant's *only relationship* to the victim's loss is by way of a crime of which the defendant was acquitted." (*Percelle, supra*, 126 Cal.App.4th at p. 180, italics added.)  That is not the situation here.  England was convicted of street terrorism.  The trial court ordered him to pay $1,975 in victim restitution to the Victims of Violent Crime Fund pursuant to section 1202.4.  As stated by the prosecution at the sentencing hearing, the $1,975 represented the victims' relocation costs.  The victims relocated as a result of the crimes against them on August 9, 2009, that is, Nase's battery of Lawrence H., Love's assault on Damon H., and Love's burglary of D.W.'s home, as well as England's active participation in a criminal street gang.  By acting with knowledge of the criminal purpose of his co-defendants and "with an intent or purpose either of committing, or of encouraging or facilitating commission of, the [offenses committed by his co-defendants]" (*People v. Beeman, supra,* 35 Cal.3d at p. 560), England's gang participation was part and parcel of the crimes that resulted in damage to the victims in the form of relocation costs.  That crime provides the relationship between England and the losses incurred by the victims, thus rendering the restitution order proper.

In his supplemental brief, England claims victim restitution increases his maximum sentence and, as such, imposition of restitution orders on judicially determined facts violated his constitutional right to a jury trial and proof of facts beyond a reasonable doubt under *Southern Union Co. v. United States* (2012) 567 U.S. ___ [183 L.Ed.2d 318]

22

(*Southern Union Co.*) and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435]. As we will explain, neither *Apprendi* nor *Southern Union Co.* applies.

We turn first to the issue of forfeiture. England argues his failure to object below does not forfeit his claim on appeal because, among other things, he could not have anticipated the change in the law occasioned by *Southern Union Co.* At the time of England's sentencing, courts had not yet held that the right to a jury determination applies to sentences of criminal fines. Thus, England did not forfeit the claim by his failure to request a jury trial. (See *People v. Black* (2007) 41 Cal.4th 799, 810 ["although challenges to procedures or to the admission of evidence normally are forfeited unless timely raised in the trial court, 'this is not so when pertinent law later changed so unforeseeably that it is unreasonable to expect trial counsel to have anticipated the change' "]; *People v. French* (2008) 43 Cal.4th 36, 48 [waiver of jury trial on lewd conduct with child did not waive right to jury trial of aggravating sentencing factor of taking advantage of position of trust and confidence, where at time of plea, no right to jury trial on such circumstance had been recognized].)

We turn next to the merits of England's claim. Prior to *Southern Union Co.*, the *Apprendi* court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond *the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi v. New Jersey*, *supra*, 530 U.S. at p. 490 [147 L.Ed.2d at p. 455], italics added.)

Thereafter, in *Southern Union Co*., the United States Supreme Court held that Sixth Amendment right to a jury applies to "sentences of criminal fines." (*Southern Union Co., supra,* 567 U.S. at p. ___ [183 L.Ed.2d at p. 325].) There, the violations at issue were punishable by, *inter alia*, a criminal fine of up to $50,000 for each day of violation. (*Id.* at p. ___ [183 L.Ed.2d at p. 325].) A jury found Southern Union violated the law, but made no specific factual finding as to the number of days it was in violation. (*Ibid.*) The trial court imposed an aggregate fine of $38.1 million, concluding from the

23

" 'content and context of the verdict all together' that the jury found a 762-day violation." (*Id.* at p. ___ [183 L.Ed.2d at p. 326].)

The United States Supreme Court held that the district court's factual finding as to the number of days Southern Union committed the crime violated its Sixth Amendment right to a jury determination. (*Southern Union Co., supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 328].) In reaching its decision, the Supreme Court held that "[c]riminal fines, like . . . other forms of punishment, are penalties inflicted by the sovereign for the commission of offenses." (*Southern Union Co., supra*, at p. ___ [183 L.Ed.2d at p. 327].)

The case before us is distinguishable from *Southern Union Co.* for several reasons. First, *Southern Union Co.* "deals with criminal fines, not [victim] restitution." (*United States v. Green* (9th Cir. 2013) 722 F.3d 1146, 1150.)

Next, contrary to England's claim that restitution orders are punitive, victim restitution, unlike a fine, generally is not considered to be a form of punishment. (*People v. Harvest* (2000) 84 Cal.App.4th 641, 646-650; *People v. Young* (1995) 38 Cal.App.4th 560, 569 [victim restitution "becomes operative as a form of punishment only where, in a specific procedural context, its imposition produces severe consequences or a serious effect"]; see *People v. Hanson* (2000) 23 Cal.4th 355, 361-362 [restitution *fine* is punishment].) Moreover, the victim restitution at issue here is not a penalty "inflicted by the sovereign for the commission of offenses." (*Southern Union Co., supra*, 567 U.S. at p. ___ [183 L.Ed.2d at p. 327].) Rather, victim restitution imposed pursuant to section 1202.4, subdivision (f), is intended to directly compensate victims of criminal activity for the resulting losses they suffer in an effort to "make the victim whole." (*People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1171-1172; see *United States v. Phillips* (9th Cir. 2012) 704 F.3d 754, 771 (*Phillips*), quoting *United States v. Newman* (9th Cir. 2011) 659 F.3d 1235, 1241 ["[F]orfeiture and restitution serve entirely distinct purposes: [¶] 'Congress conceived of forfeiture as *punishment* . . . . The purpose of restitution . . . , however, is not to punish the defendant, but to *make the victim whole again*' "].)

24

Finally, "The *Southern Union* Court explicitly held . . . that there could be no '*Apprendi* violation where no maximum is prescribed.' " (*Phillips, supra*, 704 F.3d at p. 770, quoting *Southern Union Co., supra*, 567 U.S. at p. ____ [183 L.Ed.2d at p. 330].) Because victim restitution lacks a "prescribed statutory maximum," *Southern Union Co.* does not apply. (*Phillips,* at p. 770.) We thus conclude England was not entitled to a jury trial on the issue of victim restitution.

In any event, the victim restitution award was reasonable. " ' "[S]entencing judges are given virtually unlimited discretion as to the kind of information they can consider and the source from whence it comes." [Citation.]' [Citation.] [¶] This is so because a hearing to establish the amount of restitution does not require the formalities of other phases of a criminal prosecution. [Citation.]" (*People v. Foster* (1993) 14 Cal.App.4th 939, 947; see also *People v. Hartley* (1984) 163 Cal.App.3d 126, 130.) "When the probation report includes information on the amount of the victim's loss and a recommendation as to the amount of restitution, the defendant must come forward with contrary information to challenge that amount." (*Foster*, at p. 947; see also *People v. Pinedo* (1998) 60 Cal.App.4th 1403, 1406-1407; *In re S. S.* (1995) 37 Cal.App.4th 543, 546; *Hartley*, *supra*, at p. 130.)

"When considering a trial court's restitution determination, we consider whether it is arbitrary, capricious, or beyond the bounds of reason under all the circumstances. " (*People v. Hove* (1999) 76 Cal.App.4th 1266, 1275.)

Here, the probation report recommended that the Victim Compensation and Government Claims Board be reimbursed $1,975 for "the cost of relocating after the incident for Lawrence H." D.W. testified she moved from her house approximately a month and a half after the incident. England did not provide any factual basis, or any reason whatsoever, to dispute the fact that D.W. relocated after the incident or the amount set forth in the probation report. We find no grounds on the record before us to find the restitution award unreasonable.

25

# VI

## *Witness Impeachment*

Love contends the trial court committed prejudicial error when it denied his request to impeach Damon H. with evidence of a prior misdemeanor conviction.

Evidence of past misdemeanor conduct bearing on a witness's veracity is admissible in a criminal proceeding subject to the trial court's discretion. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295.) "When exercising its discretion under Evidence Code section 352, a court must always take into account, as applicable, those factors traditionally deemed pertinent in this area. [Citations.] But additional considerations may apply when evidence other than felony convictions is offered for impeachment. In general, a misdemeanor--or any other conduct not amounting to a felony--is a less forceful indicator of immoral character or dishonesty than is a felony. Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Id.* at pp. 296-297.)

"[T]he trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice . . . . [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) A trial court's "exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*Id*. at pp. 1124-1125, italics omitted.)

No abuse of discretion appears here. Pursuant to Evidence Code section 352, the People sought to exclude evidence of Damon's prior misdemeanor conviction arising out

26

of what counsel described as a fight between Damon and his then-girlfriend during which Damon brandished a knife. Love's trial counsel, together with counsel for his co-defendants, argued the prior misdemeanor was relevant both to show Damon's access to and use of weapons in the past, and as a crime of moral turpitude with which to impeach Damon's credibility on cross-examination.

In granting the motion to exclude the prior misdemeanor, the trial court first noted the position taken by defendants--i.e., that it was Lawrence H. (not Damon H.) who possessed a gun--provided grounds for excluding the prior misdemeanor under Evidence Code section 352. Next, in applying section 352, the court stated that, because the prior misdemeanor was only "tangentially . . . relevant on the issue of credibility," the jury might potentially interpret that evidence in an inappropriate manner--to conclude Damon had a gun in the absence of any allegation in that regard. Carefully balancing the probative value of the prior misdemeanor against its prejudicial effect, the court concluded the prior should be excluded "because, one, it's tangentially related to credibility, albeit one might argue it's conduct of moral turpitude, right, but it's not conduct that specifically relates to the issue of honesty and veracity. [¶] And then, secondly, based upon what has been tendered to the Court in terms of why it's relevant, that would be the very basis to exclude it under [Evidence Code section] 352."

Love argues that, Evidence Code section 352 notwithstanding, he was denied his constitutional right to present all relevant evidence "*of significant* probative value." (*People v. Jennings* (1991) 53 Cal.3d 334, 372.) He fails, however, to demonstrate how the probative value of Damon's prior misdemeanor conviction for brandishing a knife was significant. Hence, we reject the contention.

We also reject Love's claim that the record is somehow unclear as to whether the trial court exercised, properly or at all, its discretion under Evidence Code section 352 regarding use of the prior misdemeanor conviction for purposes of impeachment. "[A] trial court, in making a determination whether certain evidence is substantially more

27

prejudicial than probative, 'need not expressly weigh prejudice against probative value--or even expressly state that [it] has done so . . . .' " (*People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)  In any event, the record reflects that the court heard argument from counsel for each defendant and sought clarification as to the defense contentions regarding alleged gun possession.  The court expressed concern regarding the relevance and potential prejudicial effect of the evidence, and concluded, without prejudice, that exclusion was appropriate in light of the prior misdemeanor's tangential relationship to Damon's credibility and its tenuous relationship to the issue of his honesty and veracity.

The trial court's ruling excluding evidence of Damon's prior misdemeanor conviction did not exceed the bounds of reason.

## VII

### *Custody Credit--Love*

Love was initially sentenced on January 28, 2011, at which time the trial court awarded him 538 days of actual custody plus 80 days of conduct credit, for a total of 618 days of presentence custody credit.  Thereafter, the court resentenced Love on February 4, 2011, but did not alter its previous custody credit award.

Love contends, and the People concede, that the trial court neglected to update Love's award of presentence custody credit when it resentenced him on February 4, 2011.  We agree and will direct the trial court to amend the abstract of judgment accordingly.

### DISPOSITION

The judgment as to defendant England is affirmed.

The trial court is directed to amend the abstract of judgment for defendant Nase to reflect that his concurrent three-year sentence for the street terrorism conviction under section 186.22(a) is stayed pursuant to section 654, and to forward a copy of the amended

28

abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment as to defendant Nase is affirmed.

The trial court is further directed to amend the abstract of judgment for defendant Love to reflect an award of 545 actual custody days, plus 81 days of conduct credit, for a total of 626 days of presentence custody credit, and to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment as to defendant Love is affirmed.


      HULL      , Acting P.  J.


We concur:


      BUTZ      , J.


      DUARTE      , J.