Filed 4/1/14  P. v. Kintz CA2/1

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B241621 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA094628) |
| v. | |
| BRIAN ZACHARY KINTZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Christian R. Gullon and Steven D. Blades, Judges.  Modified in part and affirmed in part with directions.

Richard M. Doctoroff, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M Roadarmel, Jr., Supervising Deputy Attorney General, and Daniel C. Chang, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Brian Zachary Kintz appeals from the judgment entered following a jury trial in which he was convicted of one count of making a criminal threat in violation of Penal Code section 422[1] and three counts of assault with a deadly weapon.

Defendant contends the trial court erred by failing to instruct sua sponte upon accident as a defense to assault with a deadly weapon. Trial courts have no duty to instruct sua sponte on accident.

Defendant contends trial counsel was ineffective by failing to request an accident instruction and failing to argue an accident theory. We disagree because counsel argued defendant's conduct was accidental and, in light of numerous instructions regarding the requisite intent for assault with a deadly weapon and the jury's verdicts, counsel's failure to request an accident instruction was harmless.

Defendant contends the evidence regarding intent was insufficient to support his assault with a deadly weapon convictions. We conclude the testimony of two of the victims to the effect that defendant intentionally steered his car toward the victims' car supported defendant's convictions.

Defendant also contends the evidence was insufficient to support his criminal threats conviction. We agree. The victim testified she did not take the threats seriously and there was no evidence the threats caused her sustained fear. We reduce his conviction to attempted criminal threats, for which there was substantial evidence.

Defendant contends the trial court erred by failing to instruct on attempted criminal threats as a lesser included offense and by modifying the standard jury instruction regarding criminal threats. We do not reach these issues, which are mooted by our disposition of his insufficiency of evidence claim.

Defendant contends the trial court erred by failing to give a unanimity instruction regarding the criminal threats. No unanimity instruction was required because all of his threats were connected and formed part of a single continuing transaction, as to which he

---

[1] Undesignated statutory references pertain to the Penal Code.

2

offered the same defense.

## BACKGROUND

Defendant was charged with making criminal threats against Bianca Balassi and Andrew Kashe and with assault with a deadly weapon (a car) against Balassi, Kashe, and Stephanie Stauffer. At his first trial, the jury convicted him of threatening Balassi, but could not reach verdicts on the other four counts. The court declared a mistrial as to those counts, which were retried. At the second trial, the jury convicted defendant of the three aggravated assault counts, but could not reach a verdict on the remaining criminal threat charge, which the prosecutor later agreed to dismiss.

On appeal, defendant raises claims of error regarding each trial.

In summarizing the evidence from each trial, we include only that evidence pertaining to the verdicts reached in, and appellate issues arising from, that trial.

### 1. First trial (conviction of criminal threats against Balassi)

### a. Defendant's threatening text messages

On May 25, 2011,[2] defendant fought with his girlfriend, Balassi, about a high school yearbook photograph of her sitting next to Kashe. Defendant was extremely jealous of the friendship between Balassi and Kashe. Defendant sent Balassi a text message saying he wanted to break up with her and was coming to her house to pick up his property. Balassi replied that she would deliver his property to his apartment and leave it outside the entry door. As she was walking to her car to deliver defendant's property, he began sending her threatening text messages. He continued sending these messages while she was driving to his apartment, which took about five minutes, and while she was parking her car at his apartment complex. She replied to many of the messages.

Thirteen of the threatening text messages, along with some of Balassi's responses, were introduced at trial. In the first threatening text message, defendant wrote, "'Know

---

[2] Undesignated date references pertain to 2011.

his contact was open in your phone. You're hiding something from me, and I'm going to beat the truth out of him until he stops breathing. Keep laughing, Bitch. You're next.'" Balassi testified she understood that defendant was referring to Kashe, whose contact information defendant had seen on her phone a week earlier. In the second message, defendant wrote, "'Why would I waste my time at practice if I plan on being in jail this weekend? I'm going to fucking destroy these little kids. You just don't know. Not even God can help them.'" Balassi explained defendant was supposed to be going to a soccer practice and she had been trying to motivate him to go. In the third text message, which arrived while Balassi was driving to defendant's apartment, defendant wrote, "'No answer? What are you hiding? You seem scared. Don't fucking come within arm's length of me, or I swear to fucking everything I will slap the shit out of you just like you deserve, you fucking slutty ass bitch. Hope you had fun sharing with Danny, you nasty ass.'"

After Balassi sent defendant a text saying she would leave his property outside the door, defendant responded with a text saying, "'I'm telling the truth about what I'm going to do to you. [¶] I'll be waiting. Who's taking you? I said who's taking you? Are your fingers broken or just fucking retarded.'" Next, defendant texted her, "'Tell me when you're here to get slapped.'" He then wrote, "'You won't be laughing when you get here.'" Balassi responded she would leave "'it'" by defendant's door, and he replied, "'I don't give a fuck. I'm waiting by my door just so I can give your dumb ass a taste. I'm not to be fucked with. You're going to learn one way or another.'" After defendant again wrote that he would come to her house, she replied she did not want him near her house. Defendant then wrote back, "'I'm coming bitch. I'm gonna fuck you up.'"

Balassi responded with a message asking why defendant was trying to scare her. Defendant replied, "'Just so I can give your dumb ass a taste. I'm not to be fucked with. You're going to going to learn one way or another.'" Balassi sent a message saying she did not do anything, and defendant responded, "'Took too many pics with him. You're getting your ass slapped.'" After Balassi again urged defendant to get ready for soccer

4

practice, defendant sent her a message saying, "'You seem scared. Why would you be scared if you didn't do anything? No. Shut the fuck up. My dream is joining the military after this weekend so I can be trained to be a killer. I'm signing up after I fucking destroy that bitch Andrew Kashe.'" Defendant followed this with a message reading, "'That dream is being put to the side for now. My dream right now is to fuck Andrew up and leave him bloody and bruised, crying in the street. I want to do the same to you too, so don't come near me.'" In the final message introduced at trial, defendant wrote, "'Ha, I'm in a military family. What makes you think I won't join? I want my life to be killing the fuck out of shit head Iraqis like Andrew.'"

Balassi testified she did not take defendant's threats seriously because he had always been "verbally aggressive," and she viewed the text messages as just his typical way of talking to her. She "didn't believe he was going to do the things that he said in the text." She believed, however, that he was trying to scare her and that he wanted to hurt Kashe, but she did not believe he would hurt Kashe. She considered the text messages to be hyperbolic "venting."

### b.    Defendant's physical abuse of Balassi

Defendant was outside his apartment when Balassi arrived and did not seem angry. He got in her car and she drove around the corner and parked. Upon learning that a soccer ball in Balassi's car belonged to one of her friends, defendant became jealous of the ball's owner, accused Balassi of cheating on him, and punched her right cheek with his fist. It was the first time defendant had physically abused her, and she began walking toward defendant's apartment to obtain help from his mother. As she was walking, defendant shoved her into some bushes that scraped her skin. He also scraped her arm with a rock he had been tossing around. She sat on the lawn to phone her friend and defendant spat in her face. He also repeatedly called her a slut. She resumed walking toward defendant's apartment and phoned defendant's mother. Defendant went inside the apartment, then stepped outside again and punched her in the stomach while she was speaking with his mother. Balassi left and drove to the home of her friend, Stauffer.

After defendant's physical attack on her, Balassi feared defendant. The attack and text messages changed her view of what defendant might do: "He had said these things before or talked to me in a derogatory manner, so once it actually happened, I wasn't sure what he was capable of." But she was in shock and really did not think about the text messages at that time. She did not believe he would kill or seriously injure her, but she was not sure.

After Balassi left defendant's home, defendant began apologizing to her through text and voice messages. She responded by a text message telling him not to talk to her and saying he needed to get help.

On the night of June 1, defendant chased and swerved toward Kashe's car while Balassi and Stauffer were riding in it, as more fully set forth in the summary of evidence for the second trial. Balassi testified that the car chase caused her to take the May 25 text messages seriously. She explained, "'Because of the threatening texts the week before. It showed that he wanted to hurt [Kashe], so I thought that he would do anything in order to do that even if I was in the same car as he was."

c.    **Defendant's testimony**

Defendant admitted he sent all of the text messages, but he did so because he loved Balassi and was angry, hurt, and jealous. He did not believe that she would believe he was threatening her, but admitted her responses to his text messages indicated to him she was getting scared. He further admitted he was trying to scare her, his texts threatened both Balassi and Kashe, and he intended Balassi to take him seriously. He denied he intended to act on his threats or have them communicated to Kashe.

Defendant also admitted he struck Balassi in the car, but testified he used the back of his hand, not his fist. He admitted pushing her into a bush and spitting in her face. He did not remember punching her in the stomach, but agreed he must have done so, given Balassi's testimony.

6

**2. Second trial (assault with a deadly weapon convictions)**

**a. Prosecution evidence**

At the second trial, Balassi testified to many of the same matters regarding her relationship with defendant and the May 25 breakup and texts. The trial court excluded evidence of defendant's physical attack on her.

On June 1, Balassi, Kashe, and Stauffer spent time at the home of their friend Charlie in Diamond Bar. They left together around midnight and got into Kashe's car, with Kashe driving, Balassi in the front seat, and Stauffer in the backseat. As they were about to drive away, they were all surprised to see defendant sitting in a car parked across the street from Kashe's car. Defendant seemed to be staring at Kashe.

Defendant drove his car alongside Kashe's car and began talking. Kashe had learned of defendant's threats against him and was frightened, so he phoned 911. The recording of his 911 call was played at trial. Kashe drove down the street and into a cul-de-sac, where he turned his car around. Defendant followed and partially blocked Kashe's car with his. Defendant got out of his car, approached the front of Kashe's car, and stood there screaming and repeatedly banging on the hood of Kashe's car. Defendant moved toward the driver's side of the car, and Kashe sped away. Defendant returned to his car and followed them.

Defendant sped up and followed Kashe's car so closely that Kashe could not see the headlights of defendant's car. Defendant was driving so fast that Kashe had to speed to avoid being hit. Kashe testified defendant was driving about 60 miles per hour, even on narrow residential streets. At least three times during the chase, defendant drove alongside Kashe's car and swerved his car toward Kashe's car. Kashe testified defendant first did this on a residential street that was just wide enough for one lane in each direction, with cars parked along the curb. Kashe looked at defendant when defendant's car was alongside his and saw defendant yelling and pointing at Kashe. Kashe saw defendant's hands turn the steering wheel to the right. Stauffer testified she saw defendant make "a jerking motion towards our car, swerving toward us." It appeared to

7

be an intentional movement. Kashe swerved right to avoid collision and braked to avoid hitting a parked car.

The second occasion defendant swerved toward Kashe's car was when Kashe turned onto Diamond Bar Boulevard. Defendant made the same turn while driving to Kashe's left, then moved toward Kashe, forcing him to make a tighter turn. Defendant did the same thing when Kashe turned onto Pathfinder. Defendant also threw things that struck Kashe's car as he drove alongside Kashe. Kashe made numerous turns to try to elude defendant, but defendant continued to follow them. At one point it appeared defendant had stopped following them, so they stopped in a parking lot as directed by the 911 dispatcher, but they resumed driving when defendant came speeding toward them. Eventually, a sheriff's patrol car arrived as defendant was again pulling up alongside Kashe's car.

Kashe estimated defendant chased him for 15 to 20 minutes, but he agreed with defense counsel's assertion, based upon the duration of the 911 recording, that it could have been just about 11 minutes.

b.    **Defendant's testimony**

Defendant testified he thought Balassi might be at Charlie's house on the night of June 1, so he drove there. He saw Balassi and Kashe get into a car and drove up alongside the car to get their attention. They ignored him, so he threw a packet of dental floss at their car, then followed them into the cul-de-sac. He approached Balassi's side of the car and banged on the hood to get her attention. Kashe drove away, and as he did, defendant struck Kashe's car window.

Defendant returned to his car and pursued Kashe's car. He insisted he did not exceed 40 miles per hour. He drove alongside Kashe's car to see Balassi. He did not intentionally swerve toward Kashe's car, but merely drifted toward it because he was focused on Balassi and was crying. When he realized he was drifting right, he corrected by moving left. Defendant also denied trying to cause Kashe's car to hit his car. Defendant admitted he threw things at Kashe's car, was reckless, and used bad judgment.

8

He further admitted he knew Kashe was trying to get away from him, yet he continued to pursue them, hoping they would stop, and only law enforcement intervention stopped him from chasing Kashe's car.

### 3. Sentencing

The trial court sentenced defendant to two years in prison for the assault with a deadly weapon on Balassi, with concurrent sentences on all other counts.

## DISCUSSION

### 1. Failure to instruct sua sponte on accident

Defendant contends the trial court erred by failing to instruct sua sponte with CALCRIM No. 3404, which states, "The defendant is not guilty of *<insert crime[s]>* if (he/she) acted [or failed to act] without the intent required for that crime, but acted instead accidentally. You may not find the defendant guilty of *<insert crime[s]>* unless you are convinced beyond a reasonable doubt that (he/she) acted with the required intent."

### a. Duty to instruct and standard of review

"[A] trial court in a criminal case is required—with or without a request—to give correct jury instructions on the general principles of law relevant to issues raised by the evidence." (*People v. Mutuma* (2006) 144 Cal.App.4th 635, 640.)

We independently assess whether instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) The correctness of jury instructions is determined from the entire set of instructions, not just an isolated instruction or part thereof. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1075.)

The omission of an instruction is harmless beyond a reasonable doubt where the circumstances show "'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context . . . .'" (*People v. Wright* (2006) 40 Cal.4th 81, 98, quoting *People v. Sedeno* (1974) 10 Cal.3d 703, 721.)

9

**b.      The trial court was not required to instruct sua sponte upon accident**

The "defense" of accident is, in essence, a claim that the defendant acted without the intent required for the charged offense, but instead acted accidentally.  (*People v. Anderson* (2011) 51 Cal.4th 989, 996 (*Anderson*).)  "A trial court's responsibility to instruct on accident therefore generally extends no further than the obligation to provide, *upon request*, a pinpoint instruction relating the evidence to the mental element required for the charged crime."  (*Id.* at p. 997.)

In light of *Anderson*, the trial court had no sua sponte duty to instruct upon accident, and defendant's contrary argument has no merit.

**2.      Ineffective assistance of counsel in failing to request instruction upon accident and to argue accident**

Defendant contends his trial attorney rendered ineffective assistance by failing to request an instruction upon accident and failing to argue accident to the jury.

**a.      Law regarding ineffective assistance of counsel**

A claim that counsel was ineffective requires a showing, by a preponderance of the evidence, of objectively unreasonable performance by counsel and a reasonable probability that, but for counsel's errors, the defendant would have obtained a more favorable result.  (*In re Jones* (1996) 13 Cal.4th 552, 561 (*Jones*).)  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  (*Ibid.*)

A defendant must overcome strong presumptions that counsel was effective and the challenged action might be considered sound trial strategy.  (*Jones*, *supra*, 13 Cal.4th at p. 561.)  In order to prevail on an ineffective assistance of counsel claim on appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission.  (*People v. Majors* (1998) 18 Cal.4th 385, 403.)

If the defendant fails to show prejudice, a reviewing court may reject such a claim without assessing the adequacy of counsel's performance.  (*People v. Mendoza* (2000) 24 Cal.4th 130, 170.)

10

### b.     Assault with a deadly weapon

An assault requires the willful commission of an act that by its nature will probably and directly result in injury to another (a battery), with actual knowledge of facts sufficient to establish that the act by its nature will probably and directly result in such injury. (*People v. Williams* (2001) 26 Cal.4th 779, 784.) Assault is a general intent crime, that is, the defendant's act must be intentional, but the defendant need not specifically intend to cause injury or be subjectively aware of the risk that an injury might occur. (*Id.* at pp. 788, 790.) Mere recklessness or criminal negligence is insufficient to establish the general intent for assault, however. (*Id.* at p. 788.) Neither actual physical contact with the victim nor injury to the victim is required. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.)

### c.     Counsel's failure to request an instruction upon accident did not prejudice defendant

Given defendant's testimony that his car merely drifted toward Kashe's car, and he did not turn the wheel to swerve toward it, defense counsel should have requested an instruction on accident to highlight this defense theory for the jury. Nonetheless, we conclude counsel's failure to request this instruction was not prejudicial because the issue was necessarily resolved adversely to defendant under other, properly given instructions.

The jury was instructed on the reasonable doubt standard using CALCRIM No. 220), which included the following sentence: "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt."

The jury was instructed on the elements of assault with a deadly weapon using CALCRIM No. 875. This instruction told the jury, in pertinent part, it could convict defendant of assault with a deadly weapon only if it found the prosecution had proved each element of that offense, including the following: "defendant did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person," "defendant did that act willfully," and he acted with awareness "of facts that would lead a reasonable person to realize that his act by its nature

11

would directly and probably result in the application of force to someone." The instruction further explained, "Someone commits an act *willfully* when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage."

The jury was further instructed, "The following crimes require general criminal intent: Assault with a Deadly Weapon, as charged in Counts 2, 3, and 4. For you to find a person guilty of these crimes, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime." (CALCRIM No. 252.) In addition, CALCRIM No. 225 reiterated the intent requirement and burden of proof: "The People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent. The instruction for each crime explains the intent required." The jury was also directed to consider all of the instructions together (CALCRIM No. 200).

We presume that the jury followed these instructions. (*People v. Williams* (2010) 49 Cal.4th 405, 469.)

These instructions permitted the jury to convict defendant of assault with a deadly weapon only if it found, beyond a reasonable doubt, that defendant acted willfully or on purpose, that is, he intentionally performed a prohibited act. The issue addressed by the accident instruction, whether defendant acted with the requisite intent, was not removed from the jury's consideration, but was the absence of the required willfulness element. The issue was thus necessarily resolved under other properly given instructions. If the jury had accepted defendant's testimony that his car merely drifted toward Kashe's car, the jury could not have found he willfully moved his car toward Kashe's and thus would have acquitted defendant of assault with a deadly weapon. Accordingly, there is no reasonable probability defendant would have obtained a more favorable outcome if counsel had requested an accident instruction.

12

**d. Failure to argue accident**

Defendant contends defense counsel "never argued" defendant accidentally drifted toward Kashe's car and instead criticized the prosecutor by arguing, "[A]gain and again she kept arguing, defendant said it was an accident, it was an accident. He never said it was an accident, he said he was looking at Bianca and his car drifted over. He didn't deliberately get closer to the car and then turned away."

**(1) Counsel's arguments regarding willfulness**

Defense counsel repeatedly argued the prosecution had not proved beyond a reasonable doubt that defendant's conduct was willful because Kashe's testimony was not credible and was inconsistent with both the 911 recording and the testimony of Balassi and Stauffer. Counsel also repeatedly argued defendant's car drifted toward Kashe's car, as defendant testified. Counsel argued, "My client told you that when he pulled up on the left side he was crying, he was hysterical, which Bianca confirmed that he was crying hysterically, remember? And he told you that I was looking to my right trying to see Bianca and I realized I was too close to the car, I was maybe a foot or two away. And when you look to the right your car tends to go to the right where you're looking. What did I do? I immediately yanked my car away from their car so I wouldn't be dangerously close to that car."

Defense counsel further argued, "[Defendant] told you that later on in the chase he remembers another similar situation where again he was going around a curve and he was trying to look over and see Bianca, and again as you're looking over, it tends to make your car go to the right, so his car drifted less than a foot, . . . and again he's not paying close enough attention to the road, but trying to see Bianca. And that's reckless and that's dangerous, but that's not what he's charged with . . . . And as soon as he again realized that he was within a foot or two to[o] close to the car, he again turned his wheel away . . . ." In the argument cited by defendant, counsel again argued defendant testified "he was looking at Bianca and his car drifted over. He didn't deliberately get closer to the car and then turned away."

13

Counsel also repeatedly argued Kashe, Balassi, and Stauffer were under stress and misconstrued the drift of defendant's car toward them as an intentional movement. He further argued that the testimony of these witnesses that defendant deliberately swerved toward them reflected only their impression, not "what was in my client's mind."

**(2)      Counsel argued an accident theory without using the word "accident"**

Although counsel did not use the words "accident" or "accidental," the gist of his argument was that the movement of defendant's car toward Kashe's car was accidental, not willful, intentional, or purposeful. The particular comment cited by defendant repeated this theory, while rejecting the label of accident for reasons known only to defense counsel. Counsel did not need to call defendant's version of his conduct "an accident" or "accidental" to argue that defendant did not purposely move his car toward Kashe's car, but instead defendant's car just "drifted over" because he was looking at Balassi.

Counsel's argument did not constitute objectively unreasonable performance. His choice or words to argue defendant did not act willfully was an inherently tactical matter. In addition, there is no reasonable probability defendant would have obtained a more favorable result if counsel had used the word "accident" in his argument.

Accordingly, we reject defendant's ineffective assistance of counsel claims.

**3.      Sufficiency of evidence of assault with a deadly weapon**

Defendant contends the evidence was insufficient to support his assault with a deadly weapon convictions. He specifically argues that there was insufficient evidence of intent because there was no contact between the two cars, Kashe and Stauffer "were unable to articulate any substantial facts which would differentiate [defendant's] movements from simply driving dangerously," and defendant "could have accidentally drifted toward [Kashe's] car by having his attention diverted by looking at Bianca and as a result of the dangerous chase itself."

14

### a.      Standard of review

To resolve an issue of the sufficiency of evidence, we review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable jury could find guilt beyond a reasonable doubt. (*People v. Tully* (2012) 54 Cal.4th 952, 1006.)  Substantial evidence is "'"evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."'" (*Ibid*.)  We presume the existence of every fact supporting the judgment that the jury could reasonably deduce from the evidence and make all reasonable inferences that support the judgment.  (*People v. Barnes* (1986) 42 Cal.3d 284, 303; *People v. Catlin* (2001) 26 Cal.4th 81, 139.)

Where substantial evidence supports the verdict, we must affirm, even though the evidence would also reasonably support acquittal.  (*People v. Towler* (1982) 31 Cal.3d 105, 118.)  Testimony believed by the trier of fact is rejected on appeal only if it is physically impossible that the testimony is true or its falsity is apparent without resorting to inferences or deductions.  (*People v. Allen* (1985) 165 Cal.App.3d 616, 623.)  Weaknesses and inconsistencies in eyewitness testimony are for the jury to evaluate. (*Ibid*.)  Only the trial judge or jury may determine the credibility of a witness and the facts upon which such credibility depends.  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  We may not substitute our own view of a witness's credibility.  (*Ibid.*)

### b.      Sufficient evidence supports defendant's convictions

Kashe testified he saw defendant's hands turn the steering wheel to the right while defendant was driving alongside Kashe's car.  Stauffer testified she saw defendant make "a jerking motion towards our car, swerving toward us," and this appeared to be an intentional movement.  This testimony was not physically impossible, and its falsity was not apparent without resort to inferences or deductions.  The jury also heard defendant's testimony that his car merely drifted too close to Kashe's car because he was highly emotional and looking at Balassi.  The jury's verdict demonstrates it resolved the credibility contest against defendant, and it is not the role of this court to reweigh the

15

evidence. Substantial evidence supported defendant's three assault with a deadly weapon convictions.

## 4. Sufficiency of evidence of criminal threat

Defendant contends the evidence was insufficient to support his criminal threats conviction. He specifically argues that because Balassi did not take his threats seriously until the car chase approximately one week later, there was insufficient evidence of the statutory requirements of sustained fear and a threat so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat. He further argues his "threats were clearly conditional and equivocal" because they were "directed mainly at harm to [Kashe] and conditioned on [Balassi] staying away from [Kashe]."

### a. The law regarding criminal threats

A criminal threat in violation of section 422 is a willful threat to commit a crime that will result in death or great bodily injury to another person. On its face and under the circumstances in which it is made, the threat must be so unequivocal, unconditional, immediate, and specific as to convey to its subject a gravity of purpose and an immediate prospect of execution. The threat must reasonably cause its subject sustained fear for his or her safety or that of his or her immediate family, and must have been made with the specific intent that it be taken as a threat. No intent to actually carry out the threat is required. (§ 422.)

A threat need not be completely unconditional. (*People v. Bolin* (1998) 18 Cal.4th 297, 338.) The statutory requirement that a threat be "so . . . unconditional" "'was not meant to prohibit prosecution of all threats involving an "if" clause, but only to prohibit prosecution based on threats whose conditions precluded them from conveying a gravity of purpose and imminent prospect of execution.'" (*Id.* at p. 339.) "'Language creating an apparent condition cannot save the threatener from conviction when the condition is illusory, given the reality of the circumstances surrounding the threat. A seemingly

16

conditional threat contingent on an act highly likely to occur may convey to the victim a gravity of purpose and immediate prospect of execution.'" (*Id.* at p. 340.)

"[U]nequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.  The four qualities are simply the factors to be considered in determining whether a threat, considered together with its surrounding circumstances, conveys those impressions to the victim." (*People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1157–1158.)  "Immediate prospect of execution" refers not to the likelihood that the threat will be carried out immediately, but to the seriousness and imminence of the future prospect of the threat being carried out should conditions not be met.  (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1538 (*Melhado*).)

"A threat is sufficiently specific where it threatens death or great bodily injury.  A threat is not insufficient simply because it does 'not communicate a time or precise manner of execution, section 422 does not require those details to be expressed.'" (*People v. Butler* (2000) 85 Cal.App.4th 745, 752.)

"Sustained fear" refers to fear that lasts longer than a mere momentary, fleeting, or transitory thought or emotion.  (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.)

"[A]ll of the surrounding circumstances should be taken into account to determine if a threat falls within the proscription of section 422.  This includes the defendant's mannerisms, affect, and actions involved in making the threat as well as subsequent actions taken by the defendant." (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013.) "[T]he threatening statement does not have to be the sole cause of the victim's fear and . . . a statement the victim does not initially consider a threat can later be seen that way based upon a subsequent action taken by a defendant." (*Id.* at p. 1014.)

Section 422 does not encompass every threatening statement.  It instead applies only to "a specific and narrow class of communication" (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 863), that is, threats to commit a crime that will result in death or great

17

bodily injury, and that satisfy all of the remaining elements of section 422.

**b.      Threats against Balassi**

Kashe was the principal target of defendant's threatening text messages, but several of the texts also appeared to threaten great bodily injury to Balassi. These included the following:

"'I'm going to beat the truth out of him until he stops breathing. Keep laughing, Bitch. You're next.'"

"'Don't fucking come within arm's length of me, or I swear to fucking everything I will slap the shit out of you just like you deserve, you fucking slutty ass bitch.'"

"'I don't give a fuck. I'm waiting by my door just so I can give your dumb ass a taste. I'm not to be fucked with. You're going to learn one way or another.'" (Defendant's response to Balassi's message saying she would leave his possessions by his door.)

"'I'm coming bitch. I'm going to fuck you up.'" (Defendant's response to Balassi's statement that she did not want him to come to her house.)

**c.      The threats did not place Balassi in sustained fear and thus do not support the conviction**

Balassi never testified that defendant's text messages placed her in fear, let alone sustained fear. She also did not testify that the text messages caused her sustained fear after defendant physically attacked her. She instead repeatedly testified that she did not take defendant's threats seriously and explained that he always communicated in a "verbally aggressive" way. She viewed the threats as just his typical way of talking to her and did not believe he was actually going to do the things described in the text messages. The prosecutor asked Balassi what went through her mind when she read the threat to "fuck [Kashe] up and leave him bloody and bruised, crying in the street" and wanting "to do the same to" her. Balassi responded, "It was expected just because I knew how he usually speaks, and I knew that he didn't like [Kashe], so I put them together."

18

She further testified that after receiving all those messages, she still did not take any of them seriously, she did not think defendant would hurt her or Kashe, and, having known defendant for a long time, she believed he was "venting" and the threats were "just hyperbole" and "ranting."

The prosecutor asked, "What did you do after—on May 25, 2011, you received these text messages. You've now gone to the defendant's house. He at that point had hit you when he said he was going to hit you and you didn't think he would. At that point, having received all these text messages, did that change what you thought he might do?" Balassi said, "Yes," and then explained, "He had said these things before or talked to me in a derogatory manner, so once it actually happened, I wasn't sure what he was capable of." The prosecutor followed up by asking Balassi, "How did you feel about the text made towards [Kashe] after the defendant became violent with you?" Balassi replied, "Those weren't really a thought in my head at the time. I was more in shock about what had just happened."

The prosecutor later asked Balassi what she was thinking when defendant was chasing their car on June 1. Balassi said she was scared. The prosecutor asked, "[W]hat was it that was causing you to be scared?" She responded, "Just the fact that he was chasing us and I—I was more in shock maybe than scared because of what was going on and because he was throwing things and it was just overwhelming." The prosecutor then asked if Balassi's feelings about the text messages changed as a result of the events of June 1. Balassi responded, "I took them seriously." She later explained that she feared for her life during the car chase because Kashe was in the car. She elaborated, "'Because of the threatening texts the week before. It showed that he wanted to hurt [Kashe], so I thought that he would do anything in order to do that even if I was in the same car as [Kashe] was."

Balassi testified she showed the text messages to the sheriff's deputies after the car chase only because "[t]hey had asked if I had spoken with him previously that week, and I said yes, and they asked to see the texts."

19

Viewing the evidence in the light most favorable to the conviction, there simply was no substantial evidence showing that defendant's threatening text messages caused Balassi to be in sustained fear for her safety. Although she feared defendant in the wake of his May 25 battery upon her, she never attributed her fear even in part to the text messages. Even during the June 1 car chase, when Balassi began taking the text messages seriously, she only expressed fear in regard to the threats against Kashe, not the threats against her. She feared she would be harmed only as collateral damage from defendant's attempt to harm Kashe. Her testimony thus demonstrates that defendant's threats against *her* were not a cause of her fear at that time or any other time. Her fear on June 1 instead resulted from the car chase and the threats against Kashe.

Accordingly, the evidence was insufficient to support the criminal threats conviction naming Balassi as the victim. As previously noted, the juries in both trials were unable to reach a verdict regarding the charge of criminal threats against Kashe.

**d.     The conviction may be reduced to attempted criminal threats**

Given the insufficiency of evidence, the criminal threats charge may not be retried. (*Burks v. United States* (1978) 437 U.S. 1, 18 [98 S.Ct. 2141].) Rather than simply reversing defendant's conviction, however, this court has the power and authority to modify the judgment to reflect a conviction of a lesser, necessarily included offense, such as attempted criminal threats, supported by the evidence. (§§ 1181, subd. (6), 1260; *People v. Jackson* (2000) 77 Cal.App.4th 574, 580.)

**(1)     Elements of attempted criminal threat**

"[A] defendant properly may be found guilty of attempted criminal threat whenever, acting with the specific intent to commit the offense of criminal threat, the defendant performs an act that goes beyond mere preparation and indicates that he or she is putting a plan into action. Furthermore, in view of the elements of the offense of criminal threat, a defendant acts with the specific intent to commit the offense of criminal threat only if he or she specifically intends to threaten to commit a crime resulting in death or great bodily injury with the further intent that the threat be taken as a threat,

under circumstances sufficient to convey to the person threatened a gravity of purpose and an immediate prospect of execution so as to reasonably cause the person to be in sustained fear for his or her own safety or for his or her family's safety." (*People v. Toledo* (2001) 26 Cal.4th 221, 230–231 (*Toledo*).)

*Toledo* provided several examples of circumstances giving rise to an attempted criminal threat, including the following: "[I]f a defendant . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*Toledo*, *supra*, 26 Cal.4th at p. 231.)

**(2)     The record supports a conviction of attempted criminal threat against Balassi**

This case falls within the quoted example provided in *Toledo*. Defendant's text threats to "slap the shit out of" and "fuck up" Balassi could be construed as threatening great bodily injury. The threat saying Balassi was "next" after defendant "beat the truth out of" Kashe "until he stop[ped] breathing" could be construed as a threat to kill Balassi, as well as Kashe. Defendant admitted his texts included threats against Balassi, he was trying to scare her, and he intended that she take him seriously. Considering these threats in light of defendant's immediately ensuing punching and shoving of Balassi, a trier of fact could reasonably conclude beyond a reasonable doubt they were sufficiently unequivocal, unconditional, immediate, and specific as to convey to Balassi a gravity of purpose and immediate prospect of execution.

In the context of his arguments regarding the sufficiency of evidence to support the criminal threats conviction, defendant argued that "the long, temporal gap between the time the threats were made and when [Balassi] felt threatened does not satisfy the statutory requirement that [defendant] had an 'immediate prospect of execution of the threat." However, the "immediate prospect of execution" does not refer to the likelihood

21

that the threat will be carried out immediately, but to the seriousness and imminence of the future prospect of the threat being carried out. (*Melhado*, *supra*, 60 Cal.App.4th at p. 1538.) In addition, the "temporal gap" is not an impediment to a conviction of attempted criminal threats under *Toledo*.

Defendant also argued his threats were "conditioned on [Balassi] staying away from [Kashe]." Although keeping Balassi away from Kashe may have been defendant's goal, none of the text messages expressed such a condition. The only arguably conditional message was the one warning Balassi not to "'come within arm's length of me, or I swear to fucking everything I will slap the shit out of you . . . .'" However, defendant knew Balassi was on her way to his apartment to return his belongings and said he was waiting by the door to slap her. Thus, his "conditional" threat was contingent on an act highly likely to occur, that is, Balassi coming within arm's length of him.

Under all of the circumstances, including the battery, defendant's threats were sufficient to satisfy the elements, had Balassi actually experienced sustained fear. Accordingly, the evidence supports a conviction of attempted criminal threats. Defendant essentially concedes this point by arguing the trial court erred by failing to instruct on attempted criminal threat as a lesser included offense and the "[e]vidence supported instructing the jury on attempt."

**e.     Two of defendant's remaining contentions are moot**

Defendant contends the trial court erred by failing to instruct on attempted criminal threats as a lesser included offense and by adding the following paragraph to the jury instruction on criminal threats: "The threatening statement does not have to be the sole cause of the victim's fear for his or her safety. A statement which the victim does not initially consider to be a threat can later be considered a threat because of a subsequent action or threat." These issues are mooted by our conclusion that the criminal threats conviction was not supported by sufficient evidence and our reduction of the criminal threats conviction to attempted criminal threats.

22

### 5. Failure to give unanimity instruction

At the first trial, the prosecutor requested a unanimity instruction with respect to the criminal threats charges, but the court viewed the situation as "a continuing course of conduct that is all one in the same. These texts happened all within a very brief period of time, apparently between, when it took her to leave her home and get to [defendant's] house, so I think it's all in one, all encompassing, and therefore I don't think there's a unanimity instruction issue." Defense counsel agreed and the prosecutor acquiesced.

Defendant now contends the trial court erred by failing to give a unanimity instruction and his trial attorney's acquiescence constituted ineffective assistance.

### a. Requirement of unanimity instruction

Verdicts in criminal cases must be unanimous (*People v. Collins* (1976) 17 Cal.3d 687, 693; Cal. Const., art. I, § 16) and the jurors must unanimously agree the defendant committed a specific offense. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) "[W]hen the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act" "'to prevent the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt.'" (*Ibid.*)

Accordingly, a trial court must instruct jurors that they must unanimously agree that defendant committed the same specific criminal act "'when conviction on a single count could be based on two or more discrete criminal events' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Russo*, *supra*, 25 Cal.4th at p. 1135.)

23

"[N]o unanimity instruction is required when the acts alleged are so closely connected as to form part of one continuing transaction or course of criminal conduct. 'The "continuous conduct" rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them.'" (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 275.) "That is, the failure to instruct is not error 'unless there is evidence based on which reasonable jurors could disagree as to which act the defendant committed.'" (*People v. Percelle* (2005) 126 Cal.App.4th 164, 181–182.)

b.      **No unanimity instruction was required**

Balassi testified that she received defendant's threatening text messages in a short period of time that began as she walked to her car to drive to defendant's apartment and ended when she was parking at defendant's apartment complex. She estimated it took her five minutes to get from her home to defendant's apartment complex. All of the threatening text messages, together with Balassi's own responsive messages, were introduced in the form of copies of photographs taken by deputy sheriffs in the wake of the car chase on June 1 and read into the record by Balassi. Defendant admitted sending all of the messages and his defense to all of the messages was identical.

No unanimity instruction was required. The various texts were all connected and formed part of a single continuing transaction that was essentially a single conversation. The defense to all of them was the same, and there was no evidence upon which reasonable jurors could have disagreed regarding which act defendant committed.

Accordingly, the trial court did not err by failing to give a unanimity instruction, and defense counsel was not ineffective by agreeing such an instruction was not required.

## DISPOSITION

Defendant's criminal threats conviction (count 1) is reduced to attempted criminal threats. The judgment is otherwise affirmed. The cause is remanded for resentencing on count 1.

NOT TO BE PUBLISHED.


MILLER, J.*

We concur:


ROTHSCHILD, Acting P. J.


JOHNSON, J.

---

*\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.*